**Edna L. BROWN et vir, Appellants,**

v.

**Brenda Jane VANDERVEER, Appellee.**

**No. 11779.**

Court of Civil Appeals of Texas,
Austin.

Nov. 18, 1970.

Rehearing Denied Dec. 9, 1970.

Edwards & Faulkner, John B. Faulkner, Bob K. Houser, Waco, for appellants.

Sheehy, Jones, Cureton, Westbrook & Lovelace, L. Wayne Scott, Waco, for appellee.

HUGHES, Justice.

This is a rear end automobile collision case. Mrs. Edna L. Brown, appellant, was the operator of a 1932 Chevrolet automobile which when stopped for a red signal light at the intersection of North Third Street and French Avenue in Temple, Texas, on November 22, 1967, was rear-ended by a 1959 Ford automobile driven by appellee, seventeen year old Miss Brenda Jane Vanderveer. Mrs. Brown and her husband brought suit for property damage and damages for personal injuries to Mrs. Brown. The case was tried to a jury which found appellee guilty of negligence proximately causing the collision. The jury found that damages to the Brown car were $100.-00 and that Mrs. Brown had sustained $1,000.00 damages for loss of earnings as a result of the collision and that she reasonably incurred $689.00 in medical, drug and hospital bills as a proximate result of the collision. The jury also found that Mrs. Brown had suffered no damages for personal injuries, if any, which she sustained as a result of the collision including past and future physical pain and mental anguish, if any, and for future loss of earning capacity. Judgment was rendered on the verdict and appeal by Mr. and Mrs. Brown has been perfected.

Appellants assert that the various negative answers of the jury as to damages are without any evidence to support them and that they are against the great weight and preponderance of the evidence and are manifestly unjust. We agree with the latter contention.

All of the testimony regarding the injuries sustained and physical pain and mental anguish suffered by Mrs. Brown was offered by her. Appellee offered no rebutting testimony. We have carefully read

the entire statement of facts and will briefly recite the testimony relative to these matters.

At the time of the collision appellee was driving about twenty miles per hour. The impact according to Mrs. Brown was "pretty heavy." It knocked her forward and across the steering wheel. It propelled her car into the car stopped in front of her. Both the front and back bumpers of her car were damaged. The rear tail pipe was crushed. The grill and radiator of appellee's car was damaged.

In 1967 Mrs. Brown was about 43 years of age. She had worked as a waitress for many years. She did rather heavy lifting in her work. Before this incident she had been in good health and had never suffered with pains in the neck and shoulders. Immediately after the accident she suffered a severe headache and took aspirin. She then went to the James Connally Air Force Base Hospital to see Dr. Milwe who prescribed pain pills and was told to return the next day. The next day she was so stiff and sore that it was necessary for her sister to drive her to the hospital. Mrs. Brown was not able to return to work for two weeks after the accident and she never has been able to do the heavy work she had done before. This was verified by her employer, Mr. Betros. Both Mr. Betros and Mrs. Brown's sister, Mrs. Edwards and a fellow employe Wallace Oliver, testified to complaints of pain by Mrs. Brown after the accident when there were none before and to her loss of efficiency as a worker. Mrs. Brown testified to the pain and suffering which she endured after the collision.

Mrs. Brown discontinued going to the hospital in Waco because of the distance from her home. She went to see Dr. L. E. Robertson in McGregor where Mrs. Brown lived. Dr. Robertson made X-rays and gave her muscle relaxing and pain pills. He treated her for a while and recommended that she see Dr. R. L. Stockton, a neurosurgeon.

Dr. Stockton testified by deposition and in person. He was the only medical witness. He first examined Mrs. Brown in January 1968, and testified that, "Examination of the neck revealed decreased range of motion in all quadrants. There was marked muscle spasm in the neck muscles posteriorly and this was present bilaterally. There was a tender area along the medial side of the left scapula, and that is all—that's the neck part. As far as the neurologic examination was concerned it showed the tendon reflexes equal and active. Motor functions were completely intact, sensory function revealed a decreased pin stick on the fingertips on the left hand primarily in a C7 nerve root distribution." He further testified that he was under the impression that at that time she was under a "cervical myofascial strain with mild nerve root compression, * * * and that this was probably secondary to muscular spasm." At that time he did not believe she had any kind of disc disease. The X-rays taken by Dr. Robertson shortly after the collision and interpreted by Dr. Stockton showed a "normal cervical spine with some possible increase in arthritis around the apophysial joints. * * *" Dr. Stockton prescribed a course of muscle relaxants, pain medication and cervical traction.

Dr. Stockton saw Mrs. Brown April 22, 1968 and at that time she had "enough increase in muscle spasm or something that she had an absent right biceps jerk. There was also some slight decrease in strength on the left. On May 6, Dr. Stockton saw Mrs. Brown and she had a moderate amount of relief of pain, "she was still having some decrease in strength in her left biceps. There were also decreased reflexes in both upper extremities." He saw her again on June 3, and, "At that time she was still having the pain in her neck and with radiation of pain into her left arm, with a decreased biceps jerk on that side."

Early in June Mrs. Brown was in the hospital four days when a myelogram was

performed by Dr. Stockton. This test showed some abnormalities which were not related to the accident. It also showed a "filling defect at C5–6 and C6–7, * * * on the left side. * * * usually these are the ones that are associated with a herniated nucleous pulposus in that area. * * *"

When Mrs. Brown left the hospital Dr. Stockton testified, "She was continuing to have pain and, of course, we found the disc and it was decided by the patient that she preferred to wait for an additional period of time."

Dr. Stockton saw Mrs. Brown on July 12 and she was suffering less pain but she was still having her reflex deficits. Also when he saw her on August 21 she was feeling better.

Just before September 7 Mrs. Brown began having severe pain but she was improved when Dr. Stockton saw her on September 21; and this was true when he saw her on November 20, and on February 19, 1969. On May 27, 1969, Dr. Stockton released the patient from regular visits. At that time, he said, she was having very little pain.

In June 1969 Dr. Stockton saw Mrs. Brown twice and at that time he testified she was having severe pain in her neck, left shoulder and down into her arm. The problem in her shoulder joint he thought was arthritis. We quote the following testimony of Dr. Stockton:

"Q Now, Doctor, if you assume that Edna L. Brown did not have any trouble with her neck on November the 22nd, 1967 or her shoulder or the parts of the body that you have examined and treated since January 29th, 1968, immediately before she was in a collision on November the 22nd, 1967 in which her vehicle was struck from the rear and thereafter she did have the complaints that you heard and difficulty that you saw and have treated in her body, would you have an opinion within the realm of reasonable medical probability as to what caused the trouble in Edna L. Brown's body?

A Yes. It was—in all medical probability it was related to the automobile accident that she had on that date.

Q All right, sir. Doctor, are the things that you have seen and have treated Edna L. Brown for over this period of time from January 29, 1968 through this date such that will cause pain and suffering?

A Yes. Uh-huh.

Q And is her condition one, Doctor, where she can reasonably, within a realm of reasonable medical probability, expect mental and physical pain and suffering in the future?

A Well, she hasn't cleared up as well as I would like for her to. I guess you could say that she will continue to have pain."

Dr. Stockton testified in person that he recommended an operation for Mrs. Brown for the ruptured discs because until this is done he did not believe she could get relief from pain. This operation would involve a total cost of $2,100.00. It is major surgery. Dr. Stockton also testified that the injuries sustained by Mrs. Brown in the collision probably aggravated the arthritis in her shoulder. He repeated his testimony that as of the date of trial Mrs. Brown continued to suffer mental and physical pain.

Appellee cites inconsistencies in the record to account for the jury findings which appellants attack. We quote from her brief:

"The X-rays taken immediately after the accident, and many months later, re-

vealed no defects other than arthritis in the neck and shoulder area. One doctor diagnosed the neck, arm and shoulder pain in the left side to be the result of pre-existing arthritis, while others did not. (It must be emphasized again that the jury could choose which line of testimony to believe or disbelieve.) This arthritis would cause pain in the very area where the plaintiff had her principal complaints, that is, the left neck, shoulder and arm. After this fact was brought out in depositions, the plaintiff shifted and began to complain of pain in her right arm. This certainly must have affected the jury adversely.

The appellant admitted to suffering from headaches prior to the accident. * * * The jury could, and apparently did, believe that the headaches she had after the accident were the same as before.

Then there was the evidence that by February 19, the appellant was almost completely asymptomatic, but subsequently developed severe pain with more symptoms due to four occasions of unusual activity on her part. The jury could have concluded that something in this activity, independent of any accident or injury, caused the pain. It was after these 'episodes' that Dr. Stockton ran the myelogram upon which appellant places such heavy reliance. Here again, the jury could, and apparently did, attribute the results of the myelogram to the 'episodes' or some cause other than the accident. It should be noted that while the myelograms apparently disclosed physical defects, and while the doctor felt that the plaintiff had pain as a result of the accident, the doctor did not connect the myelogram findings to the accident. The doctor's connection of the pain to the accident was largely based upon the plaintiff's own statements.

The force of the impact was another disputed item, with the plaintiff testifying that it was a 'pretty hard impact' and the defendant and her passenger testifying that it was a very light impact. The auto damage supported the latter view, as did the jury's finding of lack of excessive speed.

There is also the great discrepancy between the various witnesses as to how much time the plaintiff was off from work and when she was off. It is too voluminous to detail here, but certainly these inconsistencies unfavorably impressed the jury.

Another factor that tended to discredit the appellant's testimony was that she continued to work in Waco as a waitress while living in McGregor, thus making a long drive each day. This was contrary to her husband's testimony that 'she can't drive any more, if it's any distance.'

The mere fact that the appellant was able to obtain a different job following the accident would indicate an absence of impaired working ability as she claimed.

There are other inconsistencies, such as whether the plaintiff went into the drug store near the accident for medication immediately following the accident and the fact that she told her doctor that she had bowled since the accident, but denied that she had bowled when she testified.

Indicative of the inconsistencies in the plaintiff's testimony was her statement in chambers that she had agreed to an operation which was definitely scheduled for December 2 and her denial of this when testifying before the jury."

We need only comment about the "episodes." They consisted of doing household work such as mopping, moving about and doing other household chores.

Appellee briefs this case on the theory that "The evidence adequately supported

the jury's finding no dollar and cents award of damages for physical pain up to the time of trial, in the future or for future medical."

We believe the counter points to this effect not to be well taken.

It is true that in this case there was no visible injury sustained by Mrs. Brown. We know, though, that internal injuries may be sustained without outward signs. The jury was not asked by a separate issue whether Mrs. Brown was injured but the special issue which was answered favorably to Mrs. Brown as to loss of earnings and medical expenses and unfavorably as to past and future physical pain and mental anguish was conditioned on a finding that she was injured.

Appellee makes no contention that Mrs. Brown was not injured. None of the testimony of the several witnesses as to pain suffered by Mrs. Brown is refuted directly or indirectly. We believe it very far fetched to conclude that Mrs. Brown, shown to be a vigorous, healthy, hardworking woman before the accident would consult doctors time after time for more than a year, incurring large medical, hospital and drug bills, wear a neck brace, lose one hundred days from work and poorly perform her job unless she was suffering discomfort and pain. If Mrs. Brown suffered physical pain and mental anguish as a result of the injuries sustained in the collision caused by the negligent conduct of appellee, she should be compensated therefor. We hold, from a consideration of the entire record, that the findings of the jury indicated above are against the great weight and preponderance of the testimony and manifestly unjust.

The judgment of the Trial Court is reversed and this cause is remanded for a new trial.

Reversed and remanded.