**Gene MONTANDON, Appellant,**

v.

**John Albert COLEHOUR, Appellee.**

**No. 17224.**

Court of Civil Appeals of Texas, Fort Worth.

June 11, 1971.

Rehearing Denied July 9, 1971.

Schattman, Mock & Guthrie, and C. Coit Mock, Fort Worth, for appellant.

Touchstone, Bernays & Johnston, and Webber W. Beall, Jr., Dallas, for appellee.

## OPINION

BREWSTER, Justice.

This is a damage suit for personal injuries allegedly sustained in a rear-end automobile collision.

The appellee, Colehour, admittedly drove his car at a speed of between 20 and 25 miles an hour into the rear end of a car being operated by appellant, Montandon. At the time of impact Montandon was parked at an intersection waiting for a red traffic light to change. Colehour admitted that as he approached the point of impact he was looking down at his dashboard in an effort to adjust his car radio and that when he looked back up it was too late to prevent his car from colliding with the car Montandon was in.

The jury by its verdict found Colehour negligent in failing to keep a proper lookout, that such negligence proximately caused the wreck, and that Montandon sustained personal injuries as a direct result of the wreck. The jury answered the damage issue (No. 12) "None," and also found that Montandon did not reasonably and necessarily incur charges for medical services in the treatment of his injuries, and that he will not, in reasonable probability in the future, reasonably and necessarily incur charges for medical services in the treatment of such injuries.

Upon receipt of the verdict the trial court rendered judgment that Montandon take nothing by his suit and that he pay the court costs. Montandon, plaintiff below, has appealed from that judgment.

■ His Points Nos. 9, 10 and 11 are devoted to the contention that the jury's finding of "None" to the damage issue, after it had found that Montandon did sustain personal injuries in the collision, was against the overwhelming weight and preponderance of the evidence, and that he was entitled to recover some amount of money for the personal injuries the jury found that he did sustain and that the judgment should be set aside for these reasons.

We sustain the contention that the jury's answer of "None" to the damage issue was so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust.

Issue No. 11 of the charge inquired: "Do you find from a preponderance of the evidence that Gene Montandon sustained any personal injuries as a direct and proximate result of the occurrence in question?" The jury answered "Yes."

The charge then instructed the jury to answer Issue No. 12 only if they had answered Issue No. 11 "Yes."

Special Issue No. 12 was as follows:

"What sum of money, if any, do you find from a preponderance of the evidence, if paid now in cash, would fairly and reasonably compensate Gene Montandon for the injuries, if any, which you believe from a preponderance of the evidence he sustained as a direct and proximate result of the occurrence in question?

"In answering this special issue you are instructed that you may take into consideration the following elements of damage, if any, and none other:

"(a) the physical pain, if any, and mental anguish, if any, which you believe from a preponderance of the evidence Gene Montandon has sustained since the date of the occurrence up to the present time as a direct and proximate result of the occurrence in question.

"(b) the physical pain, if any, and mental anguish, if any, which you believe from a preponderance of the evidence Gene Montandon, in reasonable probability, will suffer in the future and after this date as a direct and proximate result of the occurrence in question.

"(c) the reasonable cash value of loss of earning capacity, if any, which you believe from a preponderance of the evidence Gene Montandon has sustained from the date of the occurrence up to the present time as a direct and proximate result of the injuries, if any, received on the occasion in question.

"(d) the reasonable cash value of loss of earning capacity, if any, which you believe from a preponderance of the evidence that Gene Montandon, in reasonable probability will sustain in the future from and after this date as a direct and proximate result of the occurrence in question.

"(Here follows an instruction that is not material here relative to not considering medical bills in answering this issue.)

"Answer in dollars and cents, if any, or 'None'."

The jury answered this issue "None."

On this occasion Montandon was driving a car owned by Jack Tarvin, Jr. Mr. Tarvin and his fiance were in the front seat of this car with Montandon at the time of the wreck, the fiance being in the middle.

Tarvin testified that this collision, occurring January 12, 1968, knocked his car half a city block; that the force of the impact caused his car to buckle in the middle; it caved the rear of the car in; and it caused the bucket seats in the car to break off and throw all three front seat occupants into the back seat; that following the wreck he went around to see about Mon-

tandon to help him over to sit on the curb but Montandon stated he did not feel like moving; that he had better kneel down where he was, so he did; the wreck occurred shortly after midnight and they took Montandon to Carswell Air Force Base Hospital in an ambulance and released him at about 2:30 A. M.; they did not sleep much that night; Montandon was pretty sick that night; Tarvin and Montandon were both then in service and under orders to report to Fort Dix, New Jersey, by midnight of the following night; they boarded a plane at 6:30 A. M. the next morning for Fort Dix; at Fort Dix Montandon complained of soreness and stiffness in his back and made the same complaints as they were flying from New York to Germany, 2 or 3 days after the collision.

The appellee, Colehour, testified that the collision knocked the front car half way through the intersection and that the streets were wet that night.

Appellee, Montandon, testified as follows: Before service he worked as field representative for an oil field supply company; this required driving in oil fields 3,000 to 5,000 miles a month; he made about $1,000 a month; he was in the hospital 2-½ hours that night; he became real sick and was throwing up just after the collision; he felt the same way when released from the hospital; by morning when he got to Dallas Love Field to board his plane his neck and shoulders had become completely stiff and he had developed a severe headache; nothing had been alleviated by the time he got to Fort Dix; he still was stiff and sick; he was still stiff and sick a few days later when they shipped him out to Germany; was sick at the stomach, his head hurt and neck was sore when he got to Germany; he did clerical work in the Army; he first saw a doctor in about December, 1968 (Dr. Priddy in Junction City, Kansas); his neck, shoulder, elbow and two fingers on right hand were bothering him then; neck was then stiff; right shoulder then seemed to crack and come out of joint; had a constant ache in his shoulder that seemed to go

down the right arm into his hand; Dr. Priddy treated him for several weeks then; did not go back to the traveling job on getting out of service in August, 1969, because his neck and shoulder bothered him and he did not feel like he could do that work any more; he gets stiff, and has headaches; he entered court reporting school because that work was not strenuous; he testified the collision knocked him from between 30 to 40 feet into the intersection to all the way through it; he tried to consult a military doctor, but never did; between December 6, 1968 and trial time he saw Dr. Priddy about ten times and Dr. Renshaw two times.

The investigating officer testified that the car Montandon was in was knocked 68 feet by the impact.

Dr. M. F. Priddy, an osteopathic physician of Junction City, Kansas, testified as follows: He saw and treated Montandon first on December 6, 1968; he then complained of having pain in his right shoulder, right elbow, neck, and upper part of dorsal spine since being in the car wreck; examination revealed pain in mid-part of cervical spine on rotating the head with pain radiating into the right arm and shoulder; flexion of the cervical spine caused pain in mid-cervical area; internal rotation of right arm produced pain in right shoulder; flexion of right wrist was painful; palpation of dorsal spine revealed apparent capsulitis between 3rd and 4th vertebra; the right shoulder, right elbow, the cervical and dorsal spines were x-rayed; the x-rays showed a loss of normal curvature or alignment between the 3rd and 4th cervical vertebra and also showed an increased joint interspace in the right shoulder; his opinion was that straightening of the cervical spine was due to muscle spasm resulting from injury sustained in the collision and that the abnormality shown by the shoulder x-ray was due to loss of muscle tone caused by a severe strain of the muscle group received in the collision; this doctor treated him about 10 times and said his charge for the treatment was $135.00, which

was reasonable and the services were reasonably required in the treatment of his injuries.

Dr. Charles Renshaw, an orthopedic specialist of Fort Worth, testified as follows: he first saw Montandon on March 3, 1970; he then complained of pain and stiffness in neck, fatigue in right arm, grating in the neck, a catch in the right shoulder, and pain in right wrist and hand; on examination he could feel the grating in the neck; he could also feel a hanging in the right shoulder on certain movements; x-rays he took of the neck showed a loss of the normal curvature of the cervical spine which loss is due to pain or muscle spasm that occurs where there has been an injury; shoulder x-rays he took showed an abnormal shoulder and he diagnosed Montandon's problems as a subluxing right shoulder and a chronic cervical strain; when he saw the patient again on May 5, 1970, there was no change; based on the history and examination his opinion was that these conditions were attributable to injuries received in the collision and he believed that driving long distances in a car would aggravate the symptoms.

The only two witnesses that testified in behalf of defendant were the defendant Colehour and the investigating officer, R. H. Autrey. Neither of them gave testimony relative to plaintiff's injuries.

Upon the trial defendant did develop the following evidence by cross-examination of plaintiff and by introduction of exhibits: the wreck occurred on January 12, 1968; plaintiff was in military service at this time; other than on the occasion when he was in the military hospital on the night of the wreck, he did not receive any treatment by military doctors for any of his complaints before December 6, 1968; the first time he saw Dr. Priddy, the civilian doctor, was on December 6, 1968; on this same day he received treatment in an Army hospital for swollen neck glands, chills and fever; he saw Dr. Priddy nine times through August 12, 1969; he had hired a lawyer before going to see Dr. Priddy and the latter's bill was sent to the lawyer who had referred plaintiff to Dr. Priddy; after August 12, 1969, he did not see another doctor until March 3, 1970, when he saw Dr. Crenshaw to whom he was referred by his Fort Worth lawyer; although plaintiff started to school in Abilene, Texas, in September, 1969, he did not see a doctor there; he has never been hospitalized for treatment, excepting his visit there the night of the wreck; approximately twenty months after the wreck, on being discharged from the Army, plaintiff signed a report of medical history for the Army wherein it was stated that he did not have and had never had frequent or severe headaches, painful or trick shoulder or elbow, or recurrent back pain and had never had an injury other than a trick or locked knee and that he had not been treated by a doctor within the last 5 years; at the trial he denied that some of these answers were true and said he signed it that way to prevent any chance of delaying his discharge from service; he signed such untrue statements even though he knew he could be fined or imprisoned for giving false answers in the report; in August, 1969, which was about one year and seven months after the wreck, he signed an application for admission into Abilene Business College which contained a statement that he was then in good physical and mental health; in October, 1969, about one year and nine months after the wreck, plaintiff made written application to Continental Trailways Bus Lines wherein he stated that he had had no serious illness or disability.

A disinterested witness, Tarvin, stated that Montandon was carried to the hospital in an ambulance after the wreck; that he was pretty sick at his stomach that night; that he complained of soreness and stiffness in his back the next day and was still complaining of these symptoms several days later.

The x-rays taken by both doctors showed that plaintiff had lost the normal curvature of the cervical spine, which they attributed

to muscle spasm from injuries received in the wreck, and that he had a defective right shoulder joint. These were parts of the body plaintiff claimed to have hurt in the wreck.

The evidence is overwhelming to the effect that at the scene of the wreck, just after the collision, that Montandon was feeling so badly that he was afraid to attempt to walk, even with assistance, to the curb for a place to sit until the ambulance arrived and that instead of doing so he just knelt down in the street.

We are convinced and hold that the jury's answer of "None" to the damage issue is so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly wrong. The overwhelming weight and preponderance of the evidence in the case shows that Montandon has sustained some past physical pain and mental anguish as a result of personal injuries sustained in the wreck in question and for which he is entitled to some compensation. This jury verdict should have been set aside and a new trial granted for this reason.

The following cases support this holding: Brown v. Vanderveer, 460 S.W.2d 502 (Austin Civ.App., 1970, no writ hist.); Allen v. Compton, 461 S.W.2d 143 (Dallas Civ.App., 1970, no writ hist.); Bolen v. Timmons, 407 S.W.2d 947 (Amarillo Civ. App., 1966, no writ hist.); Coppedge v. Kreuz, 2 S.W.2d 362 (Austin Civ.App., 1928, no writ hist.); Bittick v. Ward, 448 S.W.2d 174 (Beaumont Civ.App., 1969, ref., n. r. e.); Gallegos v. Clegg, 417 S.W.2d 347 (Corpus Christi Civ.App., 1967, ref., n. r. e.); Edmondson v. Keller, 401 S.W.2d 718 (Austin Civ.App., 1966, no writ hist.); Downing v. Uniroyal, Inc., 451 S.W.2d 279 (Dallas Civ.App., 1970, no writ hist.); Qualls v. Miller, 414 S.W.2d 746 (Texarkana Civ.App., 1967, writ dism.); Clark v. Spurdis, 258 S.W. 881 (Beaumont Civ. App., 1924, no writ hist.); and Evers v. Langerhans, 122 S.W.2d 208 (San Antonio Civ.App., 1938, no writ hist.).

By point seven Montandon contends that the trial court erred in overruling his objections to the damage issue (Issue No. 12). This issue is set out above.

The trial court overruled the following objections made by the plaintiff to this damage issue.

"(a) this charge is unduly harsh and restrictive upon the Plaintiff in that the Court in instructing the jury as to the elements to be taken into consideration by them in determining the damages accruing under this issue instructs the jury that they 'may' take into consideration the following elements, being (a), (b), (c) and (d) as contained in such Special Issue. It is further pointed out to the Court that in each of the subdivisions (a), (b), (c) and (d) the Court has instructed the jury that before they are entitled to consider these elements of damage they must first have found the existence of the elements by a preponderance of the evidence. The situation thus presented is that the Court requires the Plaintiff to prove the existence of the elements of each of these elements of damage by a preponderance of the evidence, and then instructs the jury that they 'may' consider these elements if the Plaintiff has in fact proved them by a preponderance of the evidence. The effect of this is that the Court by this Charge permits the jury to exercise their option as to whether they consider any of the elements of damage contained in this issue even if the Plaintiff has proved the existence of any or all of those elements by a preponderance of the evidence.

"Plaintiff requests the Court to change the wording of this instruction so that the Court will instruct the jury that they will take into consideration the enumerated elements of damage in the event the Plaintiff has proved the existence of those elements by a preponderance of the evidence."

We hold that the trial court erred in overruling those objections to this damage issue.

In addition to making this objection the plaintiff tendered a requested issue wherein the word "will" replaced the word "may." By point five he urges that the refusal of this requested issue was also error.

■ Even though it is the law that the amount of damages to be awarded in a damage suit is largely within the discretion of the jury, such jury must award something for every element of damage that the jury finds and believes from a preponderance of the evidence resulted from injuries sustained in the collision in question. Edmondson v. Keller, supra; Gallegos v. Clegg, supra; Qualls v. Miller, supra; Clark v. Spurdis, supra; and Evers v. Langerhans, supra.

By using the word "may" in instructing the jury as to the elements to be considered by them in answering the issue, the court failed to tell the jury that the law required them to take into consideration in arriving at an answer to this issue those of the designated elements of damage that they found and believed from a preponderance of the evidence resulted from injuries sustained in the collision.

Webster's Third New International Dictionary indicates that the word "may" is used interchangeably with the word "can" and that it compares with "might" and that it indicates a "permission" to do something. It also indicates that when the word "may" is used in statutes, deeds or contracts that it can there mean "shall" or "must."

Ballentine's Law Dictionary (Second Edition), says: "The word (may) means 'must' or 'shall' only in cases where the public interest and rights are concerned; or where the public or third persons have a claim de °jure that the power should be exercised; or where something is directed to be done for the sake of justice or the public good."

There is no question but what ordinarily the word "may" is used in a permissive sense. In other words, if a person "may" do something he is granted the permission to do it and he can do it if he wishes. It is thus placed in his option either to do or not to do such thing as he sees fit.

We are convinced that this is the effect of using the word "may" in the particular charge under consideration. The instruction would lead the jury to believe that it was entirely optional with them to consider in answering the damage issue the designated elements, even though they believed from a preponderance of the evidence that such elements of damage resulted from injuries sustained in the collision.

This is not the law. As stated, the law requires the jury to take into consideration in answering the damage issue and to award something for every one of the designated elements of damage that they believed from a preponderance of the evidence resulted from injuries sustained in the collision in question.

We believe that what happened in this case demonstrates the harm done by the use of the word "may" in the particular damage issue involved here.

The overwhelming weight and preponderance of the evidence in this case showed that the plaintiff sustained some past physical pain and mental anguish from injuries received in the collision.

Even so, the jury answered "None" to the damage issue wherein they were told that they "may" consider that element in deciding the answer to the issue.

We are convinced that the giving of this instruction was reasonably calculated to cause and probably did cause the rendition of a judgment for the defendant instead of for the plaintiff.

■ By his first four points Montandon makes the following contentions: The court erred (1) in admitting evidence that the plaintiff was attending school under

the "G.I. Bill"; (2) in admitting into evidence plaintiff's Certificate of Eligibility for Veterans Administration Benefits; (3) in overruling motion to strike the Certificate of Eligibility from the record and to instruct the jury not to consider it and his eligibility for benefits from Veterans Administration; and (4) in overruling plaintiff's motion for mistrial after admission of evidence concerning collateral benefits plaintiff was receiving and was entitled to receive from the Veterans Administration by reason of his prior military service.

The trial court admitted into evidence over plaintiff's objection a Certificate of Eligibility from the Veterans Administration certifying that Montandon was entitled to receive 36 months' schooling because of his prior military service.

The substance of the objection made by plaintiff was as follows: the exhibit is irrelevant and immaterial to any issue; it is highly prejudicial to the right of plaintiff to a fair trial for it tells the jury that by reason of his prior military service plaintiff is entitled to certain benefits from the U.S. Government and from the Veterans Administration; as such it violates the collateral source rule; any such benefits would come solely from the U.S. Government and defendant is not entitled to receive any benefit from the fact plaintiff can get these benefits from a collateral source.

In addition to the above objection the following then occurred: Plaintiff's counsel: "The Court has stated that over the objection of the Plaintiff he is going to permit this Defendant to go into the benefits and the amount of benefits that this Plaintiff is entitled to by reason of having been a member of the Armed Services of the United States, and all of such evidence when and if any is introduced along that line will also be a positive violation of the collateral source rule and will permit this jury to grant this Defendant in this lawsuit the benefit of things which it has in no way

contributed, and introduction of any such evidence will be highly prejudicial to the rights of this Plaintiff, in particular reference to the damages to which he is entitled to receive by reason of the injuries received on the occasion in question.

"I understand the Court's ruling to be that he is going to permit the Defendant to go into that and I would like to perfect my bill, if I may with the permission of the Court, and have my objection to all evidence, any question and any answer and each question and each answer that may be given in relation to any benefits which this man may be entitled to by reason of having been a member of the Armed Services without the necessity of re-stating those objections."

The Court then stated: "I will give you a continuing bill to that entire line of testimony. Of course, it is understood the Court's ruling applies only to whatever benefits he received from the government while he was attending school there, nothing else."

The court thus gave plaintiff a continuing bill and objection to admission of the exhibit and other testimony relating to benefits plaintiff might be entitled to while going to school by reason of his prior military service.

In this connection defense counsel later proved that plaintiff was eligible to go to school under the G.I. Bill; was entitled to benefits under the "G.I. Bill of Rights" by reason of his Army service; that his right to schooling lasted for 36 months; and that at trial time he was going to court reporting school under this bill. Evidence showed the tuition was $85.00 a month.

When this evidence came in plaintiff moved for a mistrial and it was overruled.

The plaintiff had testified that he did not return to his old traveling job that he had before entering service because injuries he received in the wreck rendered him phys-

ically unable to handle such a job and that he had to go to the court reporting school to retrain in a specialized field that did not require strenuous manual labor. Plaintiff was contending that he sustained a loss of earning capacity from his injuries.

Defendant contends that this testimony complained of was admissible on the question of whether plaintiff sustained a loss of earning capacity, and on the question of why he really entered court reporting school, and to show that he was accepting these educational benefits of the G.I. Bill so that he could learn court reporting and thus continue the clerical type work that he had been doing the last two years. He urges that the jury could conclude from such evidence that plaintiff's reason for entering court reporting school were other than as testified by him.

We hold that the court erred in admitting the evidence complained of.

Unquestionably the defendant was not entitled to benefit in any way because of the fact that plaintiff was receiving benefits from the U.S. Government because of his prior military service.

The case of Eichel v. New York Central R. Co., 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed. 2d 307 (U.S.Sup.Ct., 1963), was a suit for damages under the Federal Employers' Liability Act. The jury awarded $51,000 damages. Defendant contended that the trial court erred in excluding evidence that plaintiff was receiving a $190.00 a month disability pension under the Railroad Retirement Act. Defendant contended that such evidence showed motive of plaintiff in not continuing to work after the accident and was therefore admissible on that issue. No one disputed the fact that the jury could not consider evidence of disability pensions in mitigation of plaintiff's damages. The Supreme Court held this evidence inadmissible and said at page 255, 84 S.Ct. at page 317: "In our view the

likelihood of misuse by the jury clearly outweighs the value of this evidence."

The case of Kainer v. Walker, 377 S.W. 2d 613 (Tex.Sup., 1964), was a damage suit arising from a car wreck. Plaintiff contended that injuries received in the wreck forced him to retire. Defendant offered evidence that plaintiff was receiving $61.00 a month disability benefits from the Veterans Administration. He claims the evidence admissible on the issue of whether respondent would have chosen to retire even if he had not been injured. The trial court excluded the evidence. The Supreme Court said at page 617: "It was not offered for that purpose in the trial court, and evidence of payments from collateral sources certainly cannot be admitted on any such theory unless the tender is properly limited and the jury is instructed accordingly. We are not prepared to say that evidence of that nature can never be received, but it should be excluded unless clearly relevant and with substantial probative value on some disputed issue in the case."

The case of Traders & General Insurance Company v. Reed, 376 S.W.2d 591 (Corpus Christi Civ.App., 1964, ref., n. r. e.) was a workmen's compensation case. Plaintiff contended that his present disability was due to a depression or mental disease that resulted from injuries he sustained on the occasion in question. The court excluded evidence offered by defendant to prove that plaintiff was receiving $105.00 per month social security disability payments as a result of his injuries. Defendant conceded that the collateral source rule generally prohibits evidence of other payments to plaintiff from collateral sources such as this, but contended that an exception to that rule should have been made in that case because such evidence was material and relevant on the question of the duration as well as the very nature of plaintiff's disability at trial time. Defendant lost the case and made this point the basis of his appeal. The appellate court held that the evidence was

properly excluded and said, at page 595, the following:

"We believe, as stated in Chevrolet Co. v. Morphis, supra, and Eichel v. Railroad Co., supra, and in many of the authorities heretofore cited, that the injection of collateral matters, even though the jury may be instructed as to the limited purpose for which the testimony is admitted, might tend to complicate and confuse the issues of a trial. This confusing feature would be injected into any case, regardless of or perhaps even more so by reason of any special instructions to the jury as to the limited purpose for which the testimony might be considered, if collateral benefits are opened up, and the trial becomes complicated by determinations of other parties as to what constitutes disability, and complicated and confused by questions of how much the injured party is receiving from collateral sources as the result of his disability. In such event it is quite likely that the true rights of the parties might become lost."

Additional authorities that support our conclusion that the evidence in question was inadmissible are as follows: R. E. Dumas Milner Chevrolet Company v. Morphis, 337 S.W.2d 185 (Fort Worth Civ.App., 1960, ref., n. r. e.); City of Fort Worth v. Barlow, 313 S.W.2d 906 (Fort Worth Civ.App., 1958, ref., n. r. e.); and Texas Power & Light Company v. Jacobs, 323 S.W.2d 483 (Waco Civ.App., 1959, ref., n. r. e.).

From an examination of the whole record we are convinced that the error in admitting the evidence in question was reasonably calculated to cause and probably did cause the jury to return the answer that it did to the damage issue.

The appellant has urged several other points of error on this appeal that we have not referred to. We have considered each of them and hereby overrule them. We will not discuss them because our decision is already in favor of appellant, and to do so would only lengthen the opinion.

Reversed and remanded.