Catherine TAYLOR, Individually and as Next Friend of Charles D. Taylor, NCM, Appellant,

v.

AMERICAN FABRITECH, INC., Mike Hicks, Sr., and LMS Rentals, Inc., Appellees.

No. 14–02–00982–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 23, 2004.

Rehearing Overruled April 29, 2004.

---

Robert Oberholtzer, David W. Holman, Robert Alan York, Houston, Daniel Defoe, Edward J. Hershewe, Joplin, for appellant.

Christopher William Carr, Steven L. Russell, Jerry Fazio, Dallas, Carl E. Clover, Sealy, for appellees.

Panel consists of Justices ANDERSON and SEYMORE and Senior Chief Justice

PAUL C. MURPHY.*

## OPINION

PAUL C. MURPHY, Senior Chief Justice (Assigned).

Catherine Taylor, individually and as next friend of Charles Taylor, NCM, sued American Fabritech, Inc., Mike Hicks, and LMS Rentals, Inc., for injuries Charles Taylor sustained when he fell through a skylight while working on a construction project. All parties appeal from a final judgment awarding damages to Taylor but awarding certain offsets to appellees.[1]

On appeal, appellees contend the trial court erred (1) in admitting testimony from several of the plaintiff's expert witnesses, (2) in permitting the jury to view the property where the accident occurred, (3) in permitting plaintiff's counsel to make improper jury argument, and (4) in refusing to declare a mistrial after insurance coverage was mentioned before the jury. Taylor contends that the trial court erred in awarding offsets against the judgment for payments from an employee benefit plan and for any governmental benefits received. The parties are familiar with the facts, so we will not recount them in detail here. We modify the judgment to remove the offset for future governmental benefits and, as modified, affirm.

*The Experts*

In their first issue, appellees contend the trial court erred in denying their motion to exclude various experts for Taylor.[2] Stephen Estrin, a builder, testified regarding construction safety issues and OSHA requirements. Dr. Thomas Mayor, an economist, testified regarding Charles Taylor's lost earning capacity and the predicted costs of his care. Terry Winkler, M.D., testified about the "Life Care Plan" he prepared for Charles Taylor, which provided for medical care and living assistance. Lastly, Dr. William Havins, a psychologist, testified about Charles Taylor's nervous system injuries and his current and expected levels of function.

■■■■ We review challenges to the admission of expert testimony under an abuse of discretion standard.[3] The testimony of a qualified expert is generally admissible when scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue.[4] The trial court has the gatekeeper function of ensuring that expert testimony is based on a reliable foundation and is relevant to the issues in the case.[5] Once the party opposing the expert testimony specifically objects, the proponent bears the burden of demonstrating admissibility.[6]

Appellees attack the reliability of each of the experts' testimony.[7] In *Robinson*, the

---

* Senior Chief Justice Paul C. Murphy sitting by assignment.

1. Prior to trial, the parties signed a stipulation that Fabritech and LMS were operated as a single business enterprise that was an alter ego of Hicks. We therefore refer to them collectively as "appellees."

2. We address appellees' issues first because they request reversal of the judgment, whereas Taylor requests a modification of the judgment.

3. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex.1995).

4. Tex.R. Evid. 702.

5. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 728 (Tex.1998); *Robinson*, 923 S.W.2d at 556–57.

6. *Robinson*, 923 S.W.2d at 557.

7. Except as mentioned below regarding Estrin, appellees make no arguments regarding the relevance of the experts' testimony.

Texas Supreme Court held that expert opinion of a scientific nature required an initial inquiry as to whether the testimony was based on a reliable scientific foundation, and the court went on to list certain factors it deemed useful in such inquiry.[8] In *Gammill*, however, the court explained that although trial courts must assess the reliability of all expert testimony, the *Robinson* factors will not always be relevant to the inquiry, particularly when the proffered testimony is based not on scientific research or theories but on the expert's experience and knowledge in his or her field.[9]

■ Taylor's experts in the present case were not offering testimony of a scientific nature. Analyzing whether safety measures could have prevented an accident, calculating the costs of medical care, lost earnings, and living assistance, and explaining the severity of a person's injuries are not scientific inquiries under the *Robinson/Gammill* framework. In forming their opinions, these experts relied not on specific scientific research or studies but on their own experience, education, and review of the literature in their fields. Hence, the trial court was required to consider whether the testimony was based on a reliable foundation and whether it was relevant to issues in the case, but the court was not required to analyze all of the specific factors noted in *Robinson*.[10]

■ In cases involving nonscientific expert testimony, *Gammill* instructs us to consider whether there is an "analytical gap" between the experts' opinions and the bases on which they were founded.[11] Thus, we will take a closer look at each of the experts' proffered testimony, the underlying foundation of that testimony, and appellees' specific complaints, if any, regarding the reliability of the testimony.

■ Estrin's affidavit contained a lengthy explanation of the subjects he expected to testify regarding and the bases for his opinions. Generally, he expected to

---

8. *Id.* at 557. The factors include (1) the extent to which the theory has been or can be tested; (2) the extent to which the technique relies upon the subjective interpretation of the expert; (3) whether the theory has been subjected to peer review or publication; (4) the technique's potential rate of error; (5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses which have been made of the theory or technique. *Id.*

9. *Gammill*, 972 S.W.2d at 726–27.

10. *See id.* at 726. Therefore, several of appellees' arguments premised on the *Robinson* factors are not relevant to our analysis. For example, appellees argue that each of the expert's opinions (1) were prepared exclusively for Taylor's case, (2) were not subjected to peer review, and (3) were subjective in nature, and that (4) the experts acknowledged two different experts in their particular field might come to different conclusions given the same data or scenario. Regarding these complaints: (1) it does not matter overly that the experts prepared their opinions for this case because the foundation of their testimony (their experience, education, and knowledge of their fields) was not so prepared; (2) there is no requirement the particular non-scientific opinion in a given case be peer reviewed, so long as the foundation for the opinion is reliable; (3) the application of knowledge to a particular set of facts is inherently subjective; and (4) experts frequently disagree; if the potential for disagreement was a basis for refusing expert testimony such testimony would be admitted only very rarely. It is the expert's underlying reasoning or methodology that a trial court must assess for reliability, not the expert's ultimate opinion or conclusion in a given case. *See id.* at 724 (quoting *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n. 6 (4th Cir.1997)); *Robinson*, 923 S.W.2d at 555.

11. *Gammill*, 972 S.W.2d at 727; *see also JCPenney Life Ins. Co. v. Baker*, 33 S.W.3d 417, 428 (Tex.App.-Fort Worth 2000, no pet.).

testify regarding Charles Taylor's fall from a height, the availability of fall prevention equipment and techniques, and the conditions at the construction site. He based his testimony on his own experience and his knowledge in the fields of construction safety and accident investigation.[12] He stated that he had a master's degree in civil engineering and postgraduate certificates in occupational safety and health and public safety, and he has been qualified by the Workmen's Compensation Commission of Texas as a "professional safety source in construction." He has also taught courses on construction safety and specifically has taught on fall protection.[13] He stated that his analysis was based on established principles of safety engineering and management and that his investigative technique was widely accepted in the field, namely "to establish the who, what, when, why, where, and how, to analyze the events based upon the best available testimony ... then to evaluate the building plans and documents...." He listed various regulations, articles, programs, product data sheets, and case documents he relied upon in deriving his conclusions. In sum, there appears to be no significant analytical gap between Estrin's proffered testimony and the stated basis therefore.[14]

Against Estrin, appellees further specifically complain that (1) he did not perform a site inspection or review the sheriff's accident report; (2) no affidavit or deposition testimony was attached to the response to the motion to exclude; (3) his testimony was not helpful as it was in the common knowledge; and (4) he was wrong about the requirements of OSHA[15] regulations. Regarding the lack of a site inspection, Estrin indicated it was not necessary in light of the building plans and documents he was given. It should also be noted that he was shown, and allowed to review, the sheriff's report during his deposition, so by the time of trial he had, in fact, reviewed the accident report. Indeed, at the deposition he stated the report contained nothing that would make him change his conclusions regarding the incident. Appellees' second argument is based on an erroneous assertion because the record does actually contain both deposition testimony from Estrin and an affidavit signed by him.[16] On the third argument, the subject of Estrin's testimony—the necessity and adequacy of fall protection around skylights in building construction—is clearly not a matter within the knowledge of the average juror.[17] Estrin himself pointed out that he had taught courses involving fall protection. It also

---

**12.** Estrin stated he had "[p]ersonal/professional experience of over 4 decades as a construction safety manager, general contractor, construction superintendent and carpenter as pertains to the installation of skylights and the fall prevention/protection associated therewith."

**13.** Estrin's qualifications listed in his affidavit are considerably more lengthy than represented here, but appellees do not attack his qualifications, so we offer a mere excerpt to demonstrate part of the foundation of his opinions.

**14.** *See Gammill,* 972 S.W.2d at 727.

**15.** The Occupational Safety and Health Administration. The regulations in dispute are contained in 29 C.F.R. pt. 1926.1.

**16.** Although the deposition and the affidavit were not attached to the original response to the motion to exclude, they were attached to a supplemental response. Appellees make no arguments regarding timeliness of the supplemental response.

**17.** *See K–Mart Corporation v. Honeycutt,* 24 S.W.3d 357, 360 (Tex.2000) (stating expert testimony is inadmissible on a matter obviously within the common knowledge because such testimony is of no assistance to the jury).

appears highly unlikely the average juror would know what was available for such construction work or what the standards for safety were in the industry.[18]

▮▮▮▮ Lastly, appellees contend Estrin's testimony was unreliable because he erroneously stated that OSHA regulations are mandatory in Texas, citing *Supreme Beef Packers, Inc. v. Maddox*, 67 S.W.3d 453, 457 (Tex.App.-Texarkana 2002, pet. denied).[19] However, appellees cite to no place in the record where they made this argument to the trial court, nor has our review found any such argument.[20] Appellees cite to a portion of the record wherein they objected to the reading of OSHA regulations by Estrin before the jury, but this objection was premised solely on the

argument that the law should be given to the jury only in the court's charge and not read into the record by a witness. The argument is not made at that point that Estrin's testimony was unreliable because he made erroneous statements regarding OSHA, nor is the objection made at the time Estrin repeatedly made the objectionable statements.[21] Accordingly, appellees failed to preserve this argument for appellate review.[22] In sum, we find the trial court did not abuse it's discretion in admitting Estrin's expert testimony.

▮▮▮ Dr. Mayor expected to testify regarding his evaluation of economic losses suffered by Charles Taylor due to his impairment. Mayor has a Ph.D. in Economics, is a former chairman of the Depart-

18. Appellees cite to the Texas Supreme Court's opinion in *Honeycutt* in support of their contention that Estrin's testimony was a matter of general knowledge. 24 S.W.3d 357. In *Honeycutt*, the plaintiffs claimed damages as a result of being hit by shopping carts pushed by a K–Mart employee while plaintiff was sitting on the bottom rail of the "cart corral" and the corral was missing a portion of the top rail. *Id.* at 359. The plaintiff's safety expert opined that (1) the lack of a top rail created an unreasonable risk of injury, (2) the accident would not have occurred except for the lack of a top rail, (3) the employee was not properly trained in pushing carts, (4) the employee failed to keep a proper lookout, and (5) the plaintiff was not contributorily negligent for sitting on the bottom rail. *See id.* The supreme court found that the jurors did not require an expert opinion to determine whether the lack of a top rail was unreasonably dangerous, whether the shopping carts were pushed properly, or whether the plaintiff was negligent in sitting on the bottom rail. *See id.* at 361. Pushing shopping carts and the absence of a rail are a far cry from the necessity and availability of fall protection in high level building construction. Accordingly, *Honeycutt* is easily distinguishable from the present case.

19. In *Maddox*, the court held that OSHA regulations "do not establish a mandatory standard of conduct, but rather reflect a standard

of care for which the duty of compliance is conditioned on what is possible or practicable." 67 S.W.3d at 457–58.

20. *See* Tex.R.App. P. 33.1(a) (providing that to preserve complaint for appellate review, party must make a timely and sufficiently specific request, objection, or motion).

21. *See, e.g., Knox v. Taylor,* 992 S.W.2d 40, 65 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (holding complaint on appeal must comport with objection in trial court).

22. Although not mentioned on appeal, in their third filing attacking Estrin in the trial court, appellees argued that he should not be allowed to testify regarding the existence of an OSHA violation (1) because explaining the law to the jury is a function of the court and not expert witnesses, and (2) because Estrin was not an employee of OSHA or a representative of the Secretary of Labor and thus was not qualified to testify regarding OSHA violations. Again, these arguments do not comport with the arguments made on appeal. In the trial court, appellees attacked the *procedure* of allowing Estrin to read regulations to the jury and his *qualifications* to discuss those regulations, but on appeal, they attack the *substance* of his testimony. That substance was never objected to in the trial court and therefore cannot be a basis for reversal.

ment of Economics at the University of Houston, and has considerable experience in the analysis of personal injury damages. In his deposition, he stated that he based his evaluation on standardized principles in the field of economics that have been peer reviewed. He further stated he reviewed the Life Care Plan created by Dr. Winkler for Charles Taylor, as well as Taylor's medical and employment records and deposition testimony and interviews. Although he said he based his calculation, at least in part, on the level of care in the Life Care Plan, he also said he could adjust his figures accordingly if changes were made to that plan. He further stated he based his present value calculations on what has happened in the past, by looking at Taylor's earnings history, as well as statistics from the U.S. Bureau of Labor Statistics, the Census Bureau, and standardized life expectancy tables. He stated the data in these resources are subject to elaborate review mechanisms and have been found reliable. Based on these representations, we find the trial court did not err in finding Dr. Mayor's testimony was based on a reliable foundation.[23]

■ Dr. Winkler expected to testify about the Life Care Plan that he formulated for Charles Taylor. This type of plan basically outlines a disabled person's future requirements in terms of medical care and living assistance. In his deposition, Dr. Winkler stated he is a licensed medical doctor who is board certified in physical medicine, rehabilitation, and spinal cord injury medicine. He further said he is a certified life care planner and has reviewed copious amounts of literature in the field as well has having written on the subject, including portions of at least one textbook that was peer reviewed prior to publication. Winkler further stated that he has prepared, and testified regarding, numerous life care plans for other individuals. In preparing the Life Care Plan for Charles Taylor, Winkler said he reviewed Taylor's medical and nursing home records and performed a physical examination. Based on this testimony, we find that the trial court did not err in finding Dr. Winkler's testimony regarding the Life Care Plan was reliable as based on his training and experience in the field.[24]

■ Dr. Havins expected to testify regarding his evaluation of Charles Taylor's physical, mental, and emotional condition, as well as the sufficiency and efficacy of the Life Care Plan prepared by Dr. Winkler. In his deposition, Dr. Havins identified himself as a neuropsychologist, which is a field of practice concerning how injuries to the brain impact intellectual function, emotions, and behavior. He stated he has a Ph.D. in psychology, and education, training, and experience in neuropsychology. He also said he used to be the director of psychology at a rehabilitation

23. Appellees' specific objections to Dr. Mayor's testimony are largely based on *Robinson* factors that are not relevant to an analysis of his nonscientific testimony. *See Gammill,* 972 S.W.2d at 726. For example, appellees contended Mayor's report had not been subjected to peer review and was prepared specifically for this litigation, and that he had not verified the statistical data he used. *Robinson* and *Gammill* cannot be read to require every expert to have their report peer reviewed, and Mayor's explanation of his methodology and sources of data were clearly sufficient to indicate reliability. *See Gammill,* 972 S.W.2d at 728; *Robinson,* 923 S.W.2d at 556–57.

24. Regarding Winkler's testimony, appellees again scattershoot objections based largely on the *Robinson* factors. Appellees also argue Winkler's method of preparing life care plans had not been shown to be "verified or peer reviewed." To the contrary, Winkler testified at length regarding literature in the field, the training and certification process that he completed, and his own publications in the field. Appellees objections are without merit.

hospital and currently works as a neuropsychologist at a rehabilitation center. In preparing his evaluation, Dr. Havins stated he personally examined Charles Taylor and reviewed his medical records and the Life Care Plan. He further explained the basics of a neuropsychological evaluation and the bases for his opinion. Based on this testimony, we find the trial court did not err in finding Dr. Havins' testimony sufficiently reliable based on his experience and training in the field.[25]

### Jury View

 In their second issue, appellees contend the trial court erred in permitting the jury to view the premises on which the accident occurred. The jury view apparently involved a "drive by" of the building to allow jurors to see the exterior but not to enter the building. The record does not specifically reflect what the jurors saw during the site visit nor whether it was possible to see the area of the skylights from ground level. Jury views are generally considered improper in Texas[26]; particularly where, as here, one side objects.[27] Assuming jury views are error and assuming error was preserved in this case, we must consider whether the visit constituted harmful error.[28] Before an appellate court can reverse a judgment, it must determine the error committed by the trial court was reasonably calculated to cause and probably did cause the rendition of an improper judgment.[29] To begin with, the jury view appeared to be minimal in scope because, as described by the trial court, it merely involved a "drive by" of the building. Furthermore, there was substantial evidence adduced at trial regarding the premises on which the accident occurred, so the jury view was to some degree cumulative.[30] Nevertheless, appellees contend the harmful effect of the site visit is demonstrated by the "astronomical verdict" rendered by the jury. Of the approximately $20 million verdict, over $16 million was awarded for past and future medical expenses and zero was awarded in punitive damages after the jury found no malice.[31] The medical ex-

---

25. Appellees make no arguments against Dr. Havins' testimony not already addressed above.

26. *See, e.g., Woodrum Truck Lines v. Bailey,* 57 S.W.2d 92, 94 (Tex. Comm'n App.1933, judgm't adopted); *Willacy County Drainage Dist. v. Kocurek,* 717 S.W.2d 461, 463 (Tex. App.-Corpus Christi 1986, no writ); *see also* 4 Elaine A. Grafton Carlson, McDonald & Carlson Texas Civil Practice § 21:43 (2d ed.2001). *But cf.* Judge Adele Hedges & Daniel K. Hedges, Texas Practice Guide: Civil Trial §§ 11:91–11:96 (2003) (stating "Texas law is not clear whether jury views are permissible," but acknowledging a viewing does not constitute evidence). We further note that jury views are unquestionably error in criminal trials. *See Mauricio v. State,* 104 S.W.3d 919, 921–22 (Tex.App.-Houston [14th Dist.] 2003, no pet. h.) (questioning rationale of rule but following precedent barring jury views).

27. *See City of Pearland v. Alexander,* 468 S.W.2d 917, 926 (Tex.App.-Houston [1st Dist.] 1971) ("It is generally considered . . . that jury view in Texas is permissible at the discretion of the trial court only with consent of all parties to the suit."), *rev'd on other grounds,* 483 S.W.2d 244 (Tex.1972).

28. *See* Tex.R.App. P. 44.1.

29. *Weidner v. Sanchez,* 14 S.W.3d 353, 377–78 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

30. Specifically, there was testimony that the skylights were the same as at the time of the accident and even that the size of the building was the same. Photographs and schematics were also admitted showing various parts of the premises.

31. The jury awarded $1 million each for past impairment, future impairment, past pain and mental anguish, and future pain and mental anguish. It awarded $172,674 for past loss of earning capacity but zero for future loss of earning capacity.

penses were supported by evidence and appellees do not contest the sufficiency of this evidence; thus, the award cannot establish harm from juror sympathy. The remaining sums do not appear astronomical given the extent of Charles Taylor's injuries, and the response to the question on malice is clearly unavailing to appellees. Accordingly, we find the record does not support the conclusion that the jury view probably caused rendition of an improper judgment.[32] Appellees' second issue is overruled.

## Jury Argument

In their fourth issue, appellees contend the trial court committed reversible error when it permitted certain remarks made by appellant's counsel during closing argument. Improper jury argument requires reversal when: (1) there is error in the argument; (2) it was not invited or provoked; (3) the error was preserved by an objection, motion for mistrial, or motion to instruct; (4) the error was not curable by instruction, reprimand by the judge, or proper withdrawal of the statement; and (5) the argument by its nature, degree, and extent constituted reversible harmful error.[33] Specifically, appellees assert Taylor's counsel played to the jurors' sympathies when he said, "I've got kids and I know you've got kids." To understand the comment, we must first look at the context in which it was said. During trial, Michael Hicks, Jr., son of appellee Michael Hicks, Sr., testified that after Charles Taylor's accident he installed the remaining skylights using the same procedures Charles Taylor had used. Further, during closing, appellees' counsel argued "After Charlie was sent to the hospital ... Mike Hicks, Mr. Hick's own son, goes up to the roof, same manner, same procedures as Charlie did, and installed the remaining sixteen, seventeen skylights.... Again, no safety harnesses. Not any other type of gear, because it was not practical or reasonable to do that."

Immediately after Taylor's counsel's comments, appellees objected that the comments asked "the jury to put their steps in place of the parties." Before the trial court could rule, Taylor's counsel offered to rephrase it. Appellees' counsel then requested a ruling, but before the judge could rule Taylor's counsel explained that "All I am saying is it defies common sense to do that, but is it consistent with his behavior? Sure."

From this context, we glean three important points: (1) counsel's purpose was to respond to appellees' argument and convey that appellees' actions regarding safety protocol defied common sense, (2) to the extent counsel improperly asked jurors to step in the parties' shoes, he attempted to self-correct and focus his comments, and (3) by failing to pursue the objection and obtain a ruling in the face of the clarification, appellees' counsel waived the complaint.[34] Nevertheless, incurable jury argument may still be grounds for reversal on appeal so long as the issue is preserved in a motion for new trial.[35] Appellees failed to raise this issue in their motion for

---

32. *See Weidner,* 14 S.W.3d at 377–78.

33. *Melendez v. Exxon Corp.,* 998 S.W.2d 266, 280 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (citing *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839 (Tex.1979)).

34. *See* Tex R.App. P. 33.1(a) (providing that to preserve error for appeal party must make a sufficiently specific and timely request, objection, or motion); *cf. Busse v. Pac. Cattle Feeding Fund No. 1, Ltd.,* 896 S.W.2d 807, 816 (Tex.App.-Texarkana 1995, writ denied) (holding failure to obtain ruling waived issue of improper jury argument).

35. *See* Tex.R. Civ. P. 324(b).

new trial. Accordingly, it is waived, and appellees' fourth issue is overruled.

### Mention of Insurance

■■■ In their fifth issue, appellees contend the trial court erred in refusing to declare a mistrial after an expert witness, Epstein, mentioned insurance during trial. The remarks came in the form of a videotaped deposition that was to have been edited to remove the remark, but which was not so edited. On the videotape, the following exchange occurred:

Q. Well, do you think Charles Taylor's needs could be met at home versus at the Missouri Rehabilitation Center?

A. At the time he was in Missouri Rehabilitation Center?

Q. That's correct.

A. For part of the time, yes. Okay. There was a long period of time when we were asking for discharge, but I remember that there was some funding or insurance problems that kept him there, that he could have gone home earlier, yes.

After the insurance mention was brought to the court's attention, the trial judge instructed the jury as follows:

Members of the jury, one of the problems with videotapes is that sometimes there are some objections that are made, and there is not a Judge there to rule on those objections at the time the tape is made. And then I have to rule on objections after I hear the tape. We try to prevent anything being presented to you that has been ruled by the Court's objections [sic]. Sometimes the tapes are not edited properly, or for whatever rea-

son something gets in that should not have gotten in. And I want to remind you of Instruction Number Nine that I gave you when the trial first began. And that instruction reads that you should not consider, discuss or speculate whether any party is or is not protected in whole or in part by insurance of any kind, unless evidence about insurance is admitted. And even though you might have heard that word spoken, that was not admitted for the purpose of evidence. And there is still no issue that you are to be concerned about that involves insurance.

■■■ It is generally considered error for insurance coverage of either party to be mentioned by the other party during trial of a personal injury cause of action.[36] If insurance is mentioned, the trial court may either order a mistrial or instruct the jury not to consider the improper statement.[37] We presume, absent evidence to the contrary, that the jury followed such an instruction.[38] Appellees again point to the size of the verdict as evidence of the effect on the jury, but, as noted above, a large percentage of the verdict was for medical expenses which were supported by evidence and not disputed on appeal and the jury did not find malice against appellees. Under these circumstances, we find there is no evidence to suggest the jury did not follow the court's instruction. Accordingly, appellees' fifth issue is overruled.

### The Offsets

In the judgment, the trial court granted offsets as a matter of law to appellees for payments made to or for Charles Taylor

---

**36.** See, e.g., Tex.R. Evid. 411; Dennis v. Hulse, 362 S.W.2d 308, 309 (Tex.1962).

**37.** Dennis, 362 S.W.2d at 309.

**38.** See, e.g., Turner, Collie & Braden Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex. 1982); In re J.A., 109 S.W.3d 869, 874–75 (Tex.App.-Dallas 2003, pet. filed).

for medical care and disability under an employee benefit plan (totaling $437,486.20), and for any governmental benefit that defendants demonstrate Charles Taylor received before or after rendition of judgment, provided the government does not make a subrogation claim for the benefits. On appeal, Taylor contends that both offsets violate the collateral source rule. Additionally, appellees contend the trial court erred in denying (by operation of law) their motion to modify the judgment to include specific amounts Taylor received from government sources.

■ The collateral source rule is both a rule of evidence and damages.[39] Generally, it precludes a tortfeasor from obtaining the benefit of, or even mentioning, payments to the injured party from sources other than the tortfeasor.[40] In other words, the defendant is not entitled to present evidence of, or obtain an offset for, funds received by the plaintiff from a collateral source. When the defendant tortfeasor is the employer of the injured plaintiff, payments made under an employee benefit plan create a particular puzzle.

Basically, if the benefit plan is a fringe benefit for the employee, it is considered a collateral source in regard to the employer, but if the benefit was purchased for the primary purpose of protecting the employer, then the plan is not a collateral source as against the employer.[41] The reasoning is simple: if the plan was purchased for the benefit of the employer then it should be entitled to an offset for payments from the plan to the injured employee.

■ In regard to the benefit plan offset in the present case, Taylor contends the evidence was insufficient (1) to show whether the employee benefit plan was intended to protect the employer, (2) to establish the amount of payments made, and (3) to support a finding that Hicks or LMS could receive an offset when only Fabritech employed Charles Taylor. First, regarding whether the policy was primarily intended to protect the employer, we begin by noting the defendants were not subscribers to the Texas Workers' Compensation Fund, and this is one indication the benefit plan was for the protection of the employer.[42] Additionally,

**39.** See, e.g., Lee v. Lee, 47 S.W.3d 767, 777 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (stating that benefits from a collateral source may not be credited to tortfeasor); Exxon Corp. v. Shuttlesworth, 800 S.W.2d 902, 907–08 (Tex.App.-Houston [14th Dist.] 1990, no writ) (holding evidence regarding worker's compensation benefits was properly excluded by trial court); see also RESTATEMENT (SECOND) OF TORTS § 920A (1979).

**40.** See note 39 supra.

**41.** See Tarrant County Waste Disposal, Inc. v. Doss, 737 S.W.2d 607, 611 (Tex.App.-Fort Worth 1987, writ denied); S. Pac. Transp. Co. v. Allen, 525 S.W.2d 300, 306 (Tex.Civ.App.-Houston [14th Dist.] 1975, no writ); RESTATEMENT (SECOND) OF TORTS § 920A cmt. a. In Allen, we stated "as to payments made by employers, it is the nature of the payments, not their source, which is determinative of the question

of the applicability of the collateral source rule." Allen, 525 S.W.2d at 306.

**42.** See Doss, 737 S.W.2d at 611–12. Appellees suggest that the El Paso Court of Appeals opinion in Castillo v. American Garment Finishers Corp., 965 S.W.2d 646 (Tex.App.-El Paso 1998, no pet.), stands for the proposition that a non-participant in Workers' Compensation does not have to present any other evidence regarding an insurance policy in order to get an offset against tort damages. Although the Castillo court does rather summarily come to the conclusion that the purpose of the benefit plan at issue was to protect the employer, it makes no such holding as appellees suggest. Id. at 650. Instead, the court simply cited the Doss case, 737 S.W.2d 607, and then went on to address a novel issue regarding how the offset is to be applied. Doss and other authorities make it clear that the benefit plan must be shown to

the policy explicitly covered only on-the-job injuries and was not a general insurance policy for the benefit of the employee. This also strongly suggests the policy was intended to protect the employer and was not a fringe benefit for the employee.[43] Taylor points out that there was no testimony provided to explain the purpose of the policy. Although testimonial evidence of the benefit plan's purpose would have been relevant, we find that, taken together, the fact that appellees were not participants in the Workers' Compensation Fund and the fact that the policy was strictly for on-the-job injuries are sufficient to support the trial court's determination that the policy was for the protection of the employer, particularly since there is no evidence to the contrary.[44] Taylor further points out that the policy language refers to a "Plan" but that no such "Plan" was admitted into evidence.[45] Appellees suggest that in the absence of the plan it is impossible to know the nature of the payments made under the policy. To the contrary, the policy is repeatedly quite specific in stating that coverage is solely for on-the-job injuries; thus, any payments could only have been for on-the-jobs injuries.[46] Once again, the policy language itself, along with appellees' nonparticipation in Workers'

Compensation, is sufficient to support the finding that the policy was intended to protect the employer.[47]

■ Second, we examine the evidence regarding payments under the policy. In Defense Exhibit Two, Appellees submitted copies of a large number of checks written by the insurance company to Fabritech and from Fabritech to Charles Taylor and various health care providers. Taylor argues that the checks are insufficient to prove the amount paid because (1) several do not reference Taylor's name, (2) several do not mention the employer's name, (3) several do not include "an explanation of the basis of the payment," and (4) several are made payable to Fabritech. However, Exhibit Two is not as loosely organized as Taylor suggests. Although there are checks that do not reference Taylor's name, do not mention Fabritech, or do not mention a "basis of payment," the exhibit also includes charts and remittance statements that tie the checks from the insurance company to Fabritech to the checks from Fabritech to Charles Taylor and the providers.[48] Therefore, the exhibit proves the funds were spent for Charles Taylor's medical needs. Taylor does not contend that she made any evidentiary objections to Exhibit Two, and we have found none in

be for the primary purpose of protecting the employer before payments can be used to offset damages. 737 S.W.2d at 611; *see also Allen*, 525 S.W.2d at 306; RESTATEMENT (SECOND) OF TORTS § 920A cmt. a.

**43.** *See Doss*, 737 S.W.2d at 611.

**44.** The record also contains a letter, signed by Charles Taylor indicating he had read and understood it, stating that the company had established a benefit plan for on-the-job injuries. This document further supports the interpretation that the business only intended to cover on-the-job injuries.

**45.** The policy defines "Plan" to mean "the Insured's employee welfare benefit plan to the

extent it provides benefits to employees for Occupational Injury, Occupational Disease or Cumulative Trauma occurring in the Scope of Employment. . . ."

**46.** In *Allen*, we examined in detail the terms of the policy, specifically noting that in addition to "on-duty" coverage it also included coverage for the off-duty employee and the employee's family. 525 S.W.2d at 307. On that basis, we affirmed the trial court's refusal to award an offset based on the collateral source rule. *Id.*

**47.** *See Doss*, 737 S.W.2d at 611–12.

**48.** The checks made out directly to Taylor were apparently for disability payments.

the record. Nor did she apparently make any other type of objection to the court's receipt of this evidence or offer any contradicting evidence. Accordingly, we find the evidence sufficient to support the trial court's conclusion regarding the offset for payments under the benefit plan.

Regarding Taylor's third argument, that there was no evidence Hicks and LMS could receive an offset when only Fabritech employed Charles Taylor, we note that prior to trial, the parties signed a stipulation that Fabritech and LMS were operated as a single business enterprise that was an alter ego of Hicks. Taylor offers no suggestion as to why the trial court could not have relied on this stipulation in determining that the insurance policy was for the benefit of Hicks and his alter ego, the business enterprise consisting of Fabritech and LMS. The stipulation explicitly pierced the corporate veil. In sum, the trial court did not err in awarding an offset for the insurance payments as they were not from a collateral source. Accordingly, Taylor's first issue is overruled.

■ In her second issue, Taylor attacks the offset for governmental assistance. Unlike the insurance benefit plan, the purpose of governmental assistance is clearly to aid the injured person, not protect the employer/tortfeasor.[49] Accordingly, the collateral source rule applies, and appellees were entitled to neither an offset nor to present evidence of any payments.

Appellees argue, however, that an evidentiary exception applies that should have permitted them to introduce evidence of government payments to rebut Taylor's assertion of poverty or financial distress. Appellees further suggest the trial court ordered a compromise in the form of an offset to balance the interests of the parties when it did not admit the rebuttal evidence. We begin by noting appellees cite no authority that would allow such a compromise. It has been held that when a plaintiff seeks recovery of lost earnings and claims financial hardship, evidence of a collateral source may be offered to impeach the credibility of a witness regarding such hardship.[50] However, none of the cases suggests an offset, as opposed to rebuttal testimony, is a permissible compromise. Indeed, the very point of rebuttal evidence is just that—to rebut an assertion made by a witness or opposing party. If evidence of a collateral source is admitted as rebuttal evidence, it is for the purpose of rebutting the poverty claim, and not so the jury can award an offset. Here, the court imposed offset did not rebut anything and was improper. Accordingly, Taylor's second issue is granted and the judgment is modified to remove the offset for governmental benefits.

Appellees do not raise an issue on appeal that the trial court erred in refusing to admit rebuttal testimony regarding government payments; thus, we need not address this issue. Further, because we hold

**49.** *See, e.g., Lee–Wright, Inc. v. Hall,* 840 S.W.2d 572, 582 (Tex.App.-Houston [1st Dist.] 1992, no writ) (Workers' Compensation benefits); *Shuttlesworth,* 800 S.W.2d at 907–08 (same); *Hall v. Birchfield,* 718 S.W.2d 313, 338 (Tex.App.-Texarkana 1986) (state provided services free of charge), *rev'd on other grounds,* 747 S.W.2d 361 (Tex.1988); *Montandon v. Colehour,* 469 S.W.2d 222, 229 (Tex. Civ.App.-Fort Worth 1971, no writ) (Veteran's Administration benefits); *Tex. Gen. Indem. Co. v. Hamilton,* 420 S.W.2d 735, 738 (Tex.Civ.

App.-San Antonio 1967, writ ref'd n.r.e.) (Social Security benefits); *Traders & Gen. Ins. Co. v. Reed,* 376 S.W.2d 591, 593 (Tex.Civ. App.-Corpus Christi 1964, writ ref'd n.r.e.) (same).

**50.** *See, e.g., Shuttlesworth,* 800 S.W.2d at 907–08; *J.R. Beadel & Co. v. De La Garza,* 690 S.W.2d 71, 74 (Tex.App.-Dallas 1985, writ ref'd n.r.e.).

the trial court erred in granting an offset for governmental benefits, we need not address appellees' third issue in which they contend the court erred in denying (by operation of law) their motion to modify the judgment to include specific amounts Taylor received from government sources. Accordingly, it is dismissed as moot.

The trial court's judgment is modified to remove the offset for governmental benefits, and as modified, it is affirmed.