Fahim S. HALIM, Appellant

v.

Mahesh RAMCHANDANI, M.D. and
Texas Surgical Associates,
L.L.P., Appellees.

No. 14–04–00914–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 31, 2006.

Gregory Morrison and Jerry Galow, Austin, for appellants.

James R. Boston, Houston, and Diana L. Faust, Dallas, for appellees.

Panel consists of Justices FROST,

SEYMORE, and MIRABAL.*

## OPINION

KEM THOMPSON FROST, Justice.

In this medical-malpractice case, the patient appeals from a judgment on a jury verdict in favor of the surgeon and his medical practice group. After the trial court admitted expert testimony from both sides, the jury found that the surgeon's negligence, if any, did not proximately cause the injury in question. On appeal, the patient contends that the trial court erred in admitting testimony from two of the Medical Providers' experts and that the evidence is legally and factually insufficient to support the jury's finding. We conclude that the patient did not preserve error as to his legal and factual sufficiency issues and that the trial court did not reversibly err in admitting the challenged testimony from the medical providers' experts. Accordingly, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1994, appellant Fahim S. Halim was diagnosed with myasthenia gravis.[1] When the maximum dosage of prescribed medication was no longer effective to treat this condition, Halim's neurologist referred Halim to appellee Mahesh Ramchandani, M.D., a cardiothoracic surgeon working at The Methodist Hospital and associated with appellee Texas Surgical Associates, L.L.P. ("Surgical Associates"). Ramchandani recommended a thymectomy—removal of the thymus gland—to relieve the myasthenia gravis symptoms.

Before undergoing surgery, Halim had a firm, clear speaking voice, with no unusual characteristics. Immediately after the surgery, Halim's voice was hoarse and low. A post-surgical electromyography ("EMG") indicated that (1) the nerve innervating the left vocal cord had not been severed but had been damaged, and (2) the signal coming through the nerve did not have enough strength to activate the left vocal cord.[2] There was no physical injury to the vocal cords. Even after subsequent corrective surgery, Halim's voice was "very soft, almost feeble," making it difficult for people to understand him unless they were in very close proximity.

Halim sued Ramchandani, Surgical Associates, and The Methodist Hospital for the alleged injury to his vocal cords.[3] After the trial court denied in part Halim's motion to exclude expert opinion testimony

---

* Senior Justice Margaret G. Mirabal sitting by assignment.

1. Myasthenia gravis is "a disorder of neuromuscular transmission marked by fluctuating weakness and fatigue of certain voluntary muscles." STEADMAN'S MEDICAL DICTIONARY 1167 (27th ed.2000). It results from an autoimmune mechanism. *Id.*

2. Two nerves relevant to vocal cord function are discussed throughout the testimony. They are the vagus nerve and the recurrent laryngeal nerve. The vagus nerve is a mixed nerve that runs from the cranial cavity and passes down to supply several organs, including the larynx. *See* STEADMAN'S MEDICAL DICTIONARY 1202 (27th ed.2000). The recurrent laryngeal nerve is a branch of the vagus nerve. *Id.* at 1200. At one point it passes "superiorly, posterior to the common carotid artery between the trachea and the esophagus to the larynx; it supplies cardiac, tracheal, and esophageal branches and terminates as the inferior laryngeal [nerve]." *Id.* We use the terms "nerve," "nerves," or "vocal cord nerves," unless the context requires specification of one or the other of the two nerves.

3. Halim non-suited The Methodist Hospital before trial, and it is not a party to this appeal. Halim sued Surgical Associates based on theories of vicarious liability, employee-employer liability, and respondeat superior.

and denied the Medical Providers' motion to exclude expert opinion testimony from Halim's expert, the case proceeded to jury trial.

Halim called Ramchandani as his first witness.[4] Ramchandani testified that his goal in performing the thymectomy was to remove as much of the thymus gland as possible. There are two approaches to performing a thymectomy: median sternotomy and cervical (neck) incision. According to Ramchandani, the more complete thymectomy requires the first procedure, which involves cutting the mediasternum and spreading the ribs, as is done in open heart surgery. In performing this procedure on Halim, Ramchandani removed the main portion of the gland as well as the filmy strands of tissue that extend up into the neck.

During a thymectomy, a surgeon may come within one to two centimeters of the nerves that control the function of the left vocal cord.[5] Unlike the nerves controlling the diaphragm, however, the nerves controlling the vocal cords are not within the operative field and are not considered to be at risk during this type of surgery. Ramchandani conceded that a surgeon who injured the patient's vocal cord nerves during this procedure would be performing below the standard of care.

Dr. Melba Swafford administered the anesthesia for Halim's surgery. According to a handwritten entry in her operative notes, she observed, just prior to intubation, that Halim's vocal cords deviated left, something she explained as a common finding. She also noted the intubation was "difficult." She stated the difficulty was

more than likely due to the deviation of the cords. Finally, she testified that she would have included a notation in her operative notes if she believed she had damaged Halim's vocal cord.

Dr. Joseph Dineen, a retired general cardiothoracic, vascular, and general surgeon, testified for Halim. Dineen had performed fifteen or twenty thymectomies during his career. In preparation for his testimony, he reviewed Halim's medical records and the deposition testimony of the defense experts. He testified, based on a reasonable medical probability, that Ramchandani injured Halim's left recurrent laryngeal nerve. He also testified it was not possible that the anesthesiologist could have injured the nerve when there was no damage to the vocal cords.[6]

Dr. Samuel Weber was the only witness to testify for Ramchandani and Surgical Associates (collectively referred to herein as the "Medical Providers"). As an otolaryngologist and head and neck surgeon, Weber is intimately familiar with the structure of the larynx and nerves and muscles that control the voice. He explained that, when an endotracheal tube is introduced into the voice box, pressure can injure the nerves that control the process of bringing the vocal cords together. He expounded, "It is pressure either in the area of the cricothyroid joint or pressure from an endotracheal tube cuff that causes vocal cord paralysis, which can be one vocal cord or it can be both vocal cords." He qualified these statements, saying, "This isn't something that we can prove. This is what, through cadaver studies, is

---

4. The defense did not call Ramchandani in its own case or cross-examine him during Halim's case.

5. Halim's expert testified that, in all likelihood, Ramchandani did not injure the vagus nerve.

6. We discuss both Halim's and the Medical Providers' expert testimony in more detail in the analysis section that follows.

supposed to happen because we know that it happens and so we assume that it is a pressure phenomena [sic] either at the joint or somewhere in the larynx, from pressure causing the nerve not to work." He also explained, "There is no way to prove it, but we know the tube goes down, the patient has a normal voice. They wake up with surgery that has nothing to do with the larynx. It may be a hysterectomy or back surgery, they wake up with vocal cord paralysis." Over the years, Weber had treated a number of patients who had experienced this problem.

One of Ramchandani's retained experts, Dr. Charles Fraser, is a cardiothoracic surgeon and professor of surgery who performs several hundred thymectomies a year. Fraser testified he did not think it was a coincidence that there was something wrong with Halim's vocal cords and that the anesthesiologist during Halim's surgery had noted that "[v]ocal cord deviates to left."

At the close of evidence, the trial court granted Halim's motion for a directed verdict that Surgical Associates was liable for the acts of Ramchandani and denied Surgical Associates's motion for a directed verdict that it was not liable. The jury subsequently found that Ramchandani's negligence, if any, did not proximately cause Halim's injury, and the trial court rendered judgment on the verdict.

In three issues, Halim argues (1) the trial court erred in overruling his motion to exclude the testimony of Weber and Fraser and (2) the evidence is legally and factually insufficient to support the jury verdict. The Medical Providers raise two conditional cross-issues, arguing the trial court (1) erred in granting Halim's motion for directed verdict regarding Surgical Associates's liability as a partnership and (2) abused its discretion in admitting the testi-

mony of Dineen, Halim's expert on the issue of causation.

## II. ISSUES PRESENTED

Specifically, Halim asserts the following appellate issues:

(1) The trial court erred in admitting the testimony of Weber and Ramchandani regarding the possibility that Halim's injury to his left vocal fold was caused during intubation in the absence of any evidence of physical injury.

(2) The trial court erred in permitting evidence of an alleged physical anomaly in Halim in the absence of any expert testimony that such alleged anomaly played any role in proximately causing the subject injury to Halim.

(3) The evidence at trial is legally and factually insufficient to support the jury's finding that Ramchandani's negligence, if any, did not proximately cause Halim's injury.

## III. ANALYSIS

**A. Did the patient preserve error as to his legal and factual sufficiency points?**

■ In his third issue, Halim challenges the legal and factual sufficiency of the evidence to support the jury's finding that Ramchandani's negligence, if any, did not proximately cause Halim's injury. Because Halim had the burden of proof on this point, this issue amounts to an assertion that the evidence conclusively proved that Ramchandani's negligence proximately caused Halim's injury, or in the alternative, that the jury's finding to the contrary is against the great weight and preponderance of the evidence. The Medical Providers assert that Halim did not preserve error as to these arguments. We agree.

A "no evidence" issue is preserved for appeal in one of five ways: (1) a motion for instructed verdict, (2) a motion for judgment notwithstanding the verdict, (3) an objection to the submission of the issue to the jury, (4) a motion to disregard the jury's answer to a vital fact issue, or (5) a motion for new trial. *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex.1991). A party challenging the factual sufficiency of the evidence to support a jury finding must raise this issue in a motion for new trial to preserve error. TEX. R. CIV. P. 324(b)(2), (3); *Cecil*, 804 S.W.2d at 510–11.

Halim asserted a motion for directed verdict based on Surgical Associates's alleged vicarious liability for Ramchandani's negligence, if any. However, Halim did not seek an instructed or directed verdict based on any ground regarding the legal sufficiency of the evidence regarding his negligence claim against Ramchandani. Our record does not reflect that Halim filed a motion for judgment notwithstanding the verdict or a motion to disregard the jury's answer to a vital fact issue. Halim did assert objections to question one in the jury charge, which asked if Ramchandani's negligence, if any, proximately caused Halim's injury. However, Halim did not object based on the legal sufficiency of the evidence. Halim did file a motion for new trial, in which he argued that the trial court abused its discretion in admitting the testimony of Weber and Ramchandani regarding alternative possible causes of Halim's injury. Yet, in his motion for new trial, Halim does not assert that the evidence at trial is legally or factually insufficient, that Halim conclusively proved Ramchandani's negligence proximately caused Halim's injury, or that the jury's finding to the contrary is against the great weight and preponderance of the evidence. Therefore, Halim did not preserve error as to the legal and factual sufficiency arguments that he asserts in his third issue on appeal. *See City of Houston v. Precast Structures, Inc.*, 60 S.W.3d 331, 335 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (concluding appellant did not preserve error as to legal sufficiency argument); *Electronic Bankcard Sys., Inc. v. Retriever Indus., Inc.*, No. 14–04–00452–CV, 2005 WL 3435294, at *3 (Tex.App.-Houston [14th Dist.] Dec. 15, 2005, no pet.) (concluding appellant did not preserve error as to factual sufficiency argument) (mem.op.). Accordingly, we overrule Halim's third issue.

**B. Did the trial court abuse its discretion in admitting the Medical Providers' expert testimony regarding the possibility that the patient's injury to his left vocal fold was caused during intubation?**

In his first issue, Halim argues the trial court erred in admitting Weber's testimony that the injury to Halim's left vocal cord was possibly caused during intubation.[7] The trial court made the following pre-trial rulings of record:

> Yesterday, we held a pre-trial conference on March 31st and discussed the issue of admissible expert testimony and what is or may be or may not be admissible, and we reached the tentative con-

---

7. Halim also refers to Ramchandani in his statement of the first issue, but he does not mention Ramchandani's testimony in the body of his argument. Therefore, Halim has waived any challenge to Ramchandani's testimony. *See* TEX. R. APP. P. 38.1(h) (stating appellant's brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and to the record); *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 337 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (declining to address issue when parties cited no part of the record and make no specific argument in support of issue).

clusion for purposes of the trial as to testimony about the causation or theories about the causation of the injury that's in issue in this case.

As I reconstruct in my mind, the plaintiff had a number of objections to the theories being offered by the defendant as to how—or defendants, as to how this injury may have been caused, and in listening to the arguments of counsel and reading some of the depositions in [sic] the case law, I made a ruling on the motion in limine that the defendant would be allowed to go into the theories of defense that the injury was a result of a pre-existing problem with the vocal cords, perhaps aggravated by intubation in the surgery. Plaintiff has objected to that. That is the tentative ruling of the Court at this point.

The other theories of the defendant as to how the injury may have happened, I think at the time of the hearing yesterday I didn't hear any other theories that I thought were supported by adequate expert opinion, so at this point my inclination is that expert opinion only on the question of pre-existing injury and intubation would be admissible if offered by the defendant.[8]

The trial court then granted Halim a running objection "to any reference by counsel of the farm-out theory of causation other than the nerve was traumatically injured by Dr. Ramchandani." The court also informed the parties he planned "to listen very closely to the testimony of all the experts who take the stand ... and try

to make the determination that's required of me under the case law in terms of sufficiency of its reliability to be submitted to the jury."

The trial court has broad discretion to determine admissibility of evidence, and we will reverse only if there is an abuse of that discretion. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). A trial court abuses its discretion only when it acts in an unreasonable and arbitrary manner, or when it acts without reference to any guiding principles. *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 448 (Tex.App.-Houston [14th Dist.] 2002, no pet). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for it. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

As Halim correctly acknowledges, on direct examination, Weber did not testify he believed intubation had caused Halim's injury. Instead, referring to published articles, the anatomy of the areas where the nerves innervating the vocal cords are located, and his own experience, Weber opined only that "when you have an endotrachael tube in the voice box, the nerves to the voice box that control abduction or control the bringing of the vocal cords together, can be injured from pressure."[9] On cross-examination, Halim elicited Weber's testimony that, based on a differential diagnosis in which he credited Ramchandani's statement he had not injured the nerve, he (Weber) concluded the cause in this case was most likely the endotracheal

---

8. The appellate record does not contain a reporter's record, if any, of the pre-trial conference.

9. In his motion to exclude Weber's testimony, Halim argued that Weber's deposition opinion that endotrachael intubation caused Halim's injury, absent any evidence of trauma to the vocal cord, was "not based on any scientific studies or widely accepted scientific literature," but was "based purely on blind, subjective analysis." Halim's expert testified that he did not believe that intubation could have caused Halim's injury unless there was evidence of physical injury to the vocal cords, which there was not.

tube. Weber also stated that nerve injury from intubation was not common.

 Halim contends Weber's testimony was not admissible as expert testimony under Texas Rule of Evidence 702, which provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702. Rule 702 imposes a special gatekeeping obligation on the trial court to ensure the relevance and reliability of all expert testimony. *See Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 722–26 (Tex.1998). Once the party opposing expert testimony objects, the proponent bears the burden of demonstrating its admissibility. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995). Halim does not challenge Weber's qualifications. Instead, he asserts the trial court abused its broad discretion in determining that Weber's testimony satisfied the reliability requirement of Rule 702. *See id.*

In determining whether the trial court abused its discretion in ruling that Weber's testimony was reliable, we first address Halim's contention that Weber's testimony had to satisfy all of the factors set forth by the Texas Supreme Court in *Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706 (Tex.1997). In *Havner,* a toxic tort case, the Texas Supreme Court analyzed whether there was legally sufficient evidence to support a jury verdict in favor of the plaintiffs, who sought to recover for birth defects allegedly caused by the drug Benedectin. *See id.* at 706–14. The *Havner* court determined that, even when faced with only a legal sufficiency challenge, expert testimony that is unreliable under *Robinson* constitutes no evidence to support the verdict. *See id.* at 711–13. In determining whether the testimony of the plaintiffs' experts was reliable, the *Havner* court stated several times that it was applying the *Robinson* factors. *See id.* at 714, 720, 724. In doing so, the *Havner* court observed that the plaintiffs relied considerably on epidemiological studies in their attempt to prove that Benedectin is capable of causing birth defects in the general population, and therefore, the court engaged in a lengthy and detailed analysis of the epidemiological evidence allegedly showing a causal connection between exposure to Benedectin and birth defects. *See id.* at 711–30.

The *Havner* court stated it was considering "some of the difficult issues surrounding proof of causation in a toxic tort case such as this." *Id.* at 714. In light of several facts that were not disputed by the parties, the *Havner* court framed its inquiry as "what must a plaintiff establish to raise a fact issue on whether Benedectin caused an individual's birth defect?" *Id.* Halim has not cited and this court has not found a Texas case that applies the specific analysis in *Havner* regarding toxic-tort causation and epidemiological evidence to expert testimony in a medical-malpractice case. Although we apply the general reliability requirement established in *Robinson,* in the context of this case, we do not apply the *Havner* analysis.

The *Robinson* court established the reliability requirement for all expert testimony, and stated that, in determining reliability a trial court may consider many factors, including but not limited to the following:

(1) the extent to which the theory has been or can be tested,

(2) the extent to which the technique relies upon the subjective interpretation of the expert,

(3) whether the theory has been subjected to peer review and/or publication,

(4) the technique's potential rate of error,

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community, and

(6) the non-judicial uses which have been made of the theory or technique.

*Robinson,* 923 S.W.2d at 557. The reliability analysis is a flexible one, and the *Robinson* court emphasized that these six factors are non-exclusive and that trial courts may consider other factors that are helpful in determining reliability. *See id.* Consistent with this reasoning, the *Gammill* court held that, in determining reliability, a court need not apply the six *Robinson* factors to expert testimony, whether scientific or not, that is based on the expert's experience and knowledge in his field. *See Gammill,* 972 S.W.2d at 726–28; *Taylor v. American Fabritech, Inc.,* 132 S.W.3d 613, 619 (Tex.App.-Houston [14 Dist.] 2004, pet. denied). In *Gammill,* the Texas Supreme Court stated that the trial court had essentially determined the reliability of the expert testimony by asking whether there was too great an analytical-gap between the data and the opinion proffered. *See Gammill,* 972 S.W.2d at 727. The *Gammill* court reviewed the trial court's ruling for an abuse of discretion based on this same inquiry. *See id.* at 727–28. In discharging its duty as "gatekeeper," the trial court is in the best position to decide whether some or all of the *Robinson* factors and/or the *Gammill* analytical-gap test should be applied to determine the reliability of the expert's testimony. *See Gammill,* 972 S.W.2d at 726.

At trial Ramchandani argued that the *Gammill* test should be used, and the trial court described its determination of the reliability of Weber's testimony in part by stating that "Dr. Weber's testimony seems to be based on his personal experience and studies, and I think it's reliable enough to be considered by the jury." It appears that the trial court used the *Gammill* analytical-gap test to determine the reliability of Weber's expert testimony based on his experience and knowledge; therefore, we determine whether the trial court abused its discretion under this same test. *See Gammill,* 972 S.W.2d at 727–28; *Taylor,* 132 S.W.3d at 619.

### *Expert Testimony Elicited by the Medical Providers*

■ Weber's testimony on direct examination consisted primarily of (1) a physiological and anatomical explanation of how an endotracheal tube can create pressure on the nerve (that is, the recurrent laryngeal nerve) that controls the voice box (larynx) and result in vocal cord paralysis, (2) brief references to reports in the literature and to a cadaver study in which they looked "at where the nerve might be compressed,"and (3) Weber's specific reference to a patient he treated who had abdominal surgery and awakened with vocal cord paralysis. Weber explained, "This isn't something that we can prove. This is what, through cadaver studies, is supposed to happen because we know that it happens, and so we assume that it is a pressure phenomena either at the joint or somewhere in the larynx, from pressure causing the nerve to not work." On subsequent redirect examination, Weber expounded that, in the cadaver study, when they performed the dissection, they could see that the nerve sits on the muscle between the cartilage and the inside of the voice box. Therefore, "the thought is that [it's] pressure, and it's not a proof, this is what their supposition was, but it's the most logical."

At trial, Weber testified that, as an otolaryngologist head and neck surgeon, he is intimately familiar with the structure of the larynx and the nerves and muscles that control the voice. According to his deposition testimony, Weber performs thyroidectomies, in which there is a potential for paralyzing the vocal cord. During that surgery, a good thyroid surgeon dissects out the recurrent laryngeal nerve and does not injure it. According to Weber's trial testimony, on every thyroidectomy he performs, he exposes the recurrent laryngeal nerves and dissects them out. This surgical experience supports his representation that he has knowledge and experience regarding the structure of the larynx and the nerves and muscles controlling the voice. Weber also treated a number of patients with vocal cord paralysis following surgeries that did not involve the larynx. Just four weeks before trial, he treated a woman who had sustained vocal cord paralysis after a hysterectomy.

The published articles upon which Weber relied consisted of a case study,[10] an anatomical analysis based on cadaver dissection,[11] and a prescriptive article.[12] Of these, the anatomical study provides the strongest support for Weber's explanation of the possible means by which intubation can injure the vocal cord nerves. The author lists thirty-six cases taken from multinational literature of "true vocal cord paralysis following endotracheal intubation" in patients ranging in age from 15 years to 72 years, "for which there is little possible explanation aside from peripheral nerve damage [which] [p]resumably ... occurred either during the intubation or during the anesthetic." John Cavo, Jr., M.D., *True Vocal Cord Paralysis Following Intubation*, 95 LARYNGOSCOPE 1352, 1352–53 (1985). Of these, 32 cases "were clearly the outcome of endotracheal intubation." *Id.* at 1356. The author described the phenomenon as "rare." *Id.*

The author undertook a study of dissections of ten cadaver larynxes to determine the likely point of injury. *Id.* at 1352–53. Based on these dissections, he traced the location of the recurrent laryngeal nerve through the tracheal region, the cricoid region, and the thyroid region. *Id.* at 1354–55. He concluded the "probable site of injury to the recurrent laryngeal nerve to be located in the subglottic region." *Id.* at 1357.

That intubation can cause pressure on the nerves controlling the vocal cords or folds is a logical deduction from the anatomical structure as described in the ca-

---

**10.** Juhani Nuutinen, M.D. & Juhani Kärjä, M.D., *Bilateral Vocal Cord Paralysis Following General Anesthesia*, 91 The LARYNGOSCOPE 83 (1980).

**11.** John Cavo, Jr., M.D., *True Vocal Cord Paralysis Following Intubation*, 95 LARYNGOSCOPE 1352 (1985).

**12.** Ernest A. Weymuller, Jr., M.D., *Prevention and Management of Intubation Injury of the Larynx and Trachea*, 13 AM. J. OF OTOLARYNGOLOGY 139 (1992). Although the author does not cite Cavo's anatomical study, he appears, as recently as 1992, to agree with at least one of the conclusions from that study:

> Acute vocal cord paralysis after intubation probably relates to inflation of the endotrachael tube cuff at the level of the subglottic

larynx. At this location fibers of the recurrent laryngeal nerve enter between the cricoid and thyroid cartilage to innervate the intrinsic muscles of the larynx. Vocal cord paralysis is thought to result from direct pressure by the cuff causing neural injury (neuropraxia).

*Id.* at 140. Halim characterizes the article as citing only to a study on rabbits in support of this proposition. The citation to which Halim refers, however, appears later in the same paragraph in conjunction with a prescription regarding safe maximum cuff pressure. *See id.* at 140, 144 n. 2. Swafford testified she considers the *American Journal of Otolaryngology* a credible resource.

daver studies and as observed by Weber. Weber testified any type of pressure is a recognized potential element of nerve injury, and Halim does not dispute this point. Given the nature of Weber's practice and his having "[t]reated a number of patients with this problem over the years," the trial court reasonably could have inferred that Weber, independently of the litigation, reached the conclusion that intubation can cause vocal cord paralysis. *See Robinson,* 923 S.W.2d at 557 n. 2 (indicating, if expert testifies based on research conducted independent of litigation, such is important, objective proof the research comports with dictates of good science). Likewise, the trial court reasonably could have decided there was a sufficient analytical connection between Weber's knowledge of this literature and his conclusion that intubation can damage the vocal cord nerve. The trial court also reasonably could have determined there was a sufficient analytical connection between Weber's experience with patients suffering damage to the vocal cord nerve and his conclusion that intubation can damage the vocal cord nerve.

After carefully reviewing the testimony, we hold that the trial court did not act unreasonably or arbitrarily in concluding that there was not too great an analytical-gap between Weber's opinions and the basis upon they were founded. Therefore, the trial court did not abuse its discretion in determining that Weber's testimony was reliable. *See Taylor,* 132 S.W.3d at 619–23 (holding trial court did not abuse its discretion in concluding experts' testimony was reliable under analytical-gap test); *In re D.S.,* 19 S.W.3d 525, 529–30 (Tex.App.-Fort Worth 2000, no pet.) (holding that trial court did not abuse its discretion in

determining there was not too great an analytical-gap between the a doctor's expert opinions regarding the cause of a child's burns and the basis on which these opinions were founded).

### *Testimony Elicited by Patient*

Most of Weber's testimony on cross-examination was given in response to attacks on his credibility or on the validity of his testimony on direct examination. *See State v. Chavers,* 454 S.W.2d 395, 398 (Tex.1970) (stating that, once evidence has been admitted over party's objection, objecting party may, without waiving its objection, defend itself against this evidence by attacking the evidence admitted, but party may not go beyond defending itself against the evidence admitted). The trial court did not abuse its discretion in allowing this testimony. However, to the extent Weber testified on cross-examination that intubation caused Halim's vocal cord paralysis or that this injury was most likely due to intubation, this testimony exceeded the scope of the testimony introduced by Ramchandani, and thus by introducing this evidence, he waived any objection.

Although Halim obtained a pre-trial ruling and a running objection at the beginning of trial, he waived his objection to Weber's testimony that the endotracheal tube was the cause or the most likely cause of Halim's injury by being the only party to introduce this evidence.[13] *See Sw. Elec. Power Co. v. Burlington N. R.R.,* 966 S.W.2d 467, 472 (Tex.1998) (holding that objecting party waived appellate complaint regarding admission of evidence when it invited the alleged error by being the first party to introduce the allegedly objectiona-

---

13. Without waiving his objection, Halim was free to (1) attack Weber's credibility and the validity of his testimony on direct examination and (2) offer evidence to rebut Weber's testimony on direct examination. *See Chav-* *ers,* 454 S.W.2d at 398. However, Weber's testimony on cross-examination that intubation caused or likely caused Halim's specific injury does not rebut Weber's testimony that intubation *can* cause vocal cord paralysis.

ble evidence); *McInnes v. Yamaha Motor Corp., U.S.A.*, 673 S.W.2d 185, 188 (Tex. 1984) (holding that party waived objection regarding admission of evidence by being the first party to introduce that evidence at trial); *Gill v. Slovak*, No. 13–02–582–CV, 2005 WL 2805543, at *1–2 (Tex.App.-Corpus Christi Oct. 27, 2005, pet. denied) (holding that, although party at first preserved *Robinson* reliability challenge by obtaining adverse ruling from trial court, objecting party waived its right to complain about the admission of the expert testimony in question because the objecting party was the one who introduced the evidence in question at trial) (mem.op.); *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 612 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (concluding error was waived under invited-error doctrine when complaining party asserted in trial court that allegedly inadmissible evidence was an integral part of the claims at issue); *Haney v. Purcell Co.*, 796 S.W.2d 782, 788 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (holding that objecting party waived error by being the first to offer and obtain admission of allegedly objectionable evidence). Even if Halim had not waived his objection to this part of Weber's testimony, we still would conclude that the trial court did not abuse its discretion in determining that there was not too great an analytical-gap between the opinions Weber proffered and the basis upon which Weber's opinions were founded. Accordingly, we overrule Halim's first issue.

**C. Did the trial court abuse its discretion in admitting the Medical Providers' expert testimony regarding the patient's alleged physical anomaly?**

█ In issue two, Halim argues the trial court erred in permitting evidence of an alleged physical anomaly in Halim (that is, that his vocal cords deviated left) when there was no expert testimony that such an anomaly played any role in causing Halim's injuries. Halim provides this court with only two citations to purportedly objectionable testimony. Halim called Fraser as an adverse witness in his case in chief. The first citation appears in Halim's counsel's examination of Fraser:

Q All right. So it is your opinion that the damage to Mr. Halim's vocal cords occurred while he was being hospitalized?

A I think so.

Q And the only time during his hospitalization that that reasonably could have happened would be during his surgery?

A Again, the timing or how this occurred I do not know. I would have to again allude to the noted abnormality of the vocal cords at the time of intubation, which to me was puzzling.

Q So—And let's walk through that a little bit, so everybody understands. You and I know what we are talking about, but let me flesh it out a bit. What you are talking about is that as part of your work in this case, you wanted to look back and see if there was any evidence of a vocal cord deviation prior, in Mr. Halim. Right?

A Yes.

Q And your curiosity was roused by the fact that there was a note in the anesthesia record that said, Vocal [sic] cord deviated left, is how you read it?

A Yes.

Q And you found that puzzling?

A Yes.

Q You actually interpreted that note to mean the left vocal cord was deviated to the left?

A I did.

Q And—but the note actually didn't say the left vocal cord about anything [sic], did it?

A No, it didn't. It said vocal cord deviated to the left.

Q Okay. One of the things you looked at on behalf of defendants, was you wanted to look at the CT scan that was done on Mr. Halim just a week before his surgery to see if you could tell if there was any problem with the vocal cords, right?

A That is correct.

Q And that CT was done on him in order to check him out before surgery?

A Yes.

Q And when you looked at the CT scan, you found no evidence of deviation, correct?

A That is correct.[14]

The second passage to which Halim objects was elicited on Ramchandani's subsequent examination of Fraser:

Q What she noted down here, can you read that?

A In the comments?

Q Yes.

A "Vocal cord deviates to left."

Q Now, that comment section, is that reserved for the anesthesiologist to write whatever?

A Yes.

Q Is it your experience that anesthesiologists routinely document what they think to be a normal finding?

A In the comments section?

Q Yes.

A They do not.

Q Would it make sense to you that if this is documented in the comments section, probably she found it a bit unusual that the vocal cord is deviated to the left?

[Halim's counsel]: Continue to object as leading.

[Trial Court]: Sustained.

Q (By Medical Providers' counsel) What do you make of her having taken the time to write that comment on the chart?

A Well, as I noted in my original review of the records and my deposition, same thing. It didn't seem to me a coincidence that there was something wrong with the vocal cords.

Q In order for her to see the cord at this point, would this observation have had to have been made before the surgery?

A The patient is anesthetized and has a breathing tube or has endotracheal intubation before the surgery. Again, as I was alluding to earlier, in terms of a fixable point in time to document where the vocal cords were.

Q So then in light of the way things were done with the patient being intubated before—and by intubated, I mean a tube stuck down the throat to allow breathing when you're unconscious, in light of the way that's done, this observation, would I be correct in saying, had to be made before the operation took place?

A Yes. The anesthesia is induced and the anesthesiologist looks down into the wind pipe so that he or she may

14. Halim cites a single page for both passages. In this excerpt, as in the following excerpt, we include testimony preceding and following the cited page to put the testimony in context.

visualize the proper hole to put the tube in. The proper orifice.

During his examination of Fraser, Halim's counsel referred to deposition testimony by Swafford in which Swafford stated her comment did not mean there was anything wrong with one vocal cord but that she was saying Halim had an anatomical anomaly because the whole structure of his throat shifts to the left at the vocal cord level. After Fraser's testimony, Halim called Swafford as a witness. Swafford testified she had noted Halim's "[v]ocal cords deviated to the left" because the entire area of Halim's vocal cords shifted to the left. Swafford indicated that this condition was common and that some people are just born with a different anatomical structure. Swafford also testified that the reason she noted that Halim's intubation was difficult was "more than likely ... because of the deviation of the cords." Halim's motion to exclude did not refer to Swafford's testimony, and Halim does not challenge Swafford's testimony on appeal or argue it was necessary to rebut Fraser's testimony. Presuming for the sake of argument that the trial court erred in admitting evidence of Halim's alleged physical anomaly, given Swafford's testimony regarding this anomaly, we cannot say that any error in admitting the quoted portion of Fraser's testimony probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a); *Richardson v. Green,* 677 S.W.2d 497, 501 (Tex.1984) (stating general rule that that error in the admission of testimony is deemed harmless if the objecting party subsequently permits the same or similar evidence to be introduced without objection); *Olympic Arms, Inc. v. Green,* 176 S.W.3d 567, 586–87 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (holding party waived objection to testimony because the same or similar testimony was later introduced without objection). Accordingly, we overrule the second issue.

Having overruled Halim's three issues, we need not address the Medical Providers' conditional cross-issues. We affirm the trial court's judgment.