Affirmed and Opinion filed August 31, 2006








Affirmed and Opinion filed August 31, 2006.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00914-CV

____________

 

FAHIM S. HALIM, Appellant

 

V.

 

MAHESH RAMCHANDANI, M.D. and TEXAS
SURGICAL ASSOCIATES, L.L.P., Appellees

 



 

On Appeal from the 189th
District Court

Harris County, Texas

Trial Court Cause No. 02-28984

 



 

O P I N I O N








In this medical-malpractice case, the patient appeals from
a judgment on a jury verdict in favor of the surgeon and his medical practice
group.  After the trial court admitted expert  testimony from both sides, the
jury found that the surgeon=s negligence, if any, did not proximately
cause the injury in question.  On appeal, the patient contends that the trial
court erred in admitting testimony from two of the Medical Providers= experts and that
the evidence is legally and factually insufficient to support the jury=s finding.  We
conclude that the patient did not preserve error as to his legal and factual
sufficiency issues and that the trial court did not reversibly err in admitting
the challenged testimony from the medical providers= experts. 
Accordingly, we affirm the trial court=s judgment.

I.  Factual and Procedural Background

In 1994, appellant Fahim S. Halim was diagnosed with
myasthenia gravis.[1] 
When the maximum dosage of prescribed medication was no longer effective to
treat this condition, Halim=s neurologist referred Halim to appellee
Mahesh Ramchandani, M.D., a cardiothoracic surgeon working at The Methodist
Hospital and associated with appellee Texas Surgical Associates, L.L.P. (ASurgical
Associates@).  Ramchandani recommended a thymectomyCremoval of the
thymus glandCto relieve the myasthenia gravis symptoms.

Before undergoing surgery, Halim had a firm, clear speaking
voice, with no unusual characteristics.  Immediately after the surgery, Halim=s voice was hoarse
and low.  A post-surgical electromyography (AEMG@) indicated that
(1) the nerve innervating the left vocal cord had not been severed but had been
damaged, and (2) the signal coming through the nerve did not have enough
strength to activate the left vocal cord.[2] 
There was no physical injury to the vocal cords.  Even after subsequent
corrective surgery, Halim=s voice was Avery soft, almost
feeble,@ making it
difficult for people to understand him unless they were in very close
proximity.








Halim sued Ramchandani, Surgical Associates, and The
Methodist Hospital for the alleged injury to his vocal cords.[3] 
After the trial court denied in part Halim=s motion to
exclude expert opinion testimony and denied the Medical Providers= motion to exclude
expert opinion testimony from Halim=s expert, the case
proceeded to jury trial.

Halim called Ramchandani as his first witness.[4] 
Ramchandani testified that his goal in performing the thymectomy was to remove
as much of the thymus gland as possible.  There are two approaches to
performing a thymectomy: median sternotomy and cervical (neck) incision. 
According to Ramchandani, the more complete thymectomy requires the first
procedure, which involves cutting the mediasternum and spreading the ribs, as
is done in open heart surgery.  In performing this procedure on Halim,
Ramchandani removed the main portion of the gland as well as  the filmy strands
of tissue that extend up into the neck.

During a thymectomy, a surgeon may come within one to two
centimeters of the nerves that control the function of the left vocal cord.[5] 
Unlike the nerves controlling the diaphragm, however, the nerves controlling
the vocal cords are not within the operative field and are not considered to be
at risk during this type of surgery.  Ramchandani conceded that a surgeon who
injured the patient=s vocal cord nerves during this procedure
would be performing below the standard of care. 








Dr. Melba Swafford administered the anesthesia for Halim=s surgery. 
According to a handwritten entry in her operative notes, she observed, just
prior to intubation, that Halim=s vocal cords deviated left, something she
explained as a common finding.  She also noted the intubation was Adifficult.@  She stated the
difficulty was more than likely due to the deviation of the cords.  Finally,
she testified that she would have included a notation in her operative notes if
she believed she had damaged Halim=s vocal cord.

Dr. Joseph Dineen, a retired general cardiothoracic,
vascular, and general surgeon, testified for Halim.  Dineen had performed
fifteen or twenty thymectomies during his career.  In preparation for his
testimony, he reviewed Halim=s medical records and the deposition
testimony of the defense experts.  He testified, based on a reasonable medical
probability, that Ramchandani injured Halim=s left recurrent
laryngeal nerve.  He also testified it was not possible that the
anesthesiologist could have injured the nerve when there was no damage to the
vocal cords.[6]

Dr. Samuel Weber was the only witness to testify for
Ramchandani and Surgical Associates (collectively referred to herein as the AMedical Providers@).  As an
otolaryngologist and head and neck surgeon, Weber is intimately familiar with
the structure of the larynx and nerves and muscles that control the voice.  He
explained that, when an endotracheal tube is introduced into the voice box,
pressure can injure the nerves that control the process of bringing the vocal
cords together.  He expounded, AIt is pressure either in the area of the
cricothyroid joint or pressure from an endotracheal tube cuff that causes vocal
cord paralysis, which can be one vocal cord or it can be both vocal cords.@  He qualified
these statements, saying, AThis isn=t something that
we can prove.  This is what, through cadaver studies, is supposed to happen
because we know that it happens and so we assume that it is a pressure
phenomena [sic] either at the joint or somewhere in the larynx, from pressure
causing the nerve not to work.@  He also explained, AThere is no way to
prove it, but we know the tube goes down, the patient has a normal voice.  They
wake up with surgery that has nothing to do with the larynx.  It may be a
hysterectomy or back surgery, they wake up with vocal cord paralysis.@  Over the years,
Weber had treated a number of patients who had experienced this problem.








One of Ramchandani=s retained
experts, Dr. Charles Fraser, is a cardiothoracic surgeon and professor of
surgery who performs several hundred thymectomies a year.  Fraser testified he
did not think it was a coincidence that there was something wrong with Halim=s vocal cords and
that the anesthesiologist
during
Halim=s surgery had
noted that A[v]ocal cord deviates to left.@  

At the close of evidence, the trial court granted Halim=s motion for a
directed verdict that Surgical Associates was liable for the acts of
Ramchandani and denied Surgical Associates=s motion for a
directed verdict that it was not liable.  The jury subsequently found that
Ramchandani=s negligence, if any, did not proximately cause Halim=s injury, and the
trial court rendered judgment on the verdict.

In three issues, Halim argues (1) the trial court erred in
overruling his motion to exclude the testimony of Weber and Fraser and (2) the
evidence is legally and factually insufficient to support the jury verdict.  
The Medical Providers raise two conditional cross-issues, arguing the trial
court (1) erred in granting Halim=s motion for
directed verdict regarding Surgical Associates=s liability as a
partnership and (2) abused its discretion in admitting the testimony of Dineen,
Halim=s expert on the
issue of causation.

II.  Issues Presented

Specifically, Halim asserts the
following appellate issues:

(1)     The trial court erred in admitting the testimony
of Weber and Ramchandani regarding the possibility that Halim=s injury to his left vocal fold was
caused during intubation in the absence of any evidence of physical injury.

(2)     The trial court erred in permitting evidence
of an alleged physical anomaly in Halim in the absence of any expert testimony
that such alleged anomaly played any role in proximately causing the subject
injury to Halim.

(3)     The evidence at trial is legally and
factually insufficient to support the jury=s finding that Ramchandani=s negligence, if any, did not proximately cause
Halim=s injury.

 








                                                    III. 
Analysis

A.      Did the patient preserve
error as to his legal and factual sufficiency points?

In his third issue, Halim challenges the legal and factual
sufficiency of the evidence to support the jury=s finding that
Ramchandani=s negligence, if any, did not proximately cause Halim=s injury.  Because
Halim had the burden of proof on this point, this issue amounts to an assertion
that the evidence conclusively proved that Ramchandani=s negligence
proximately caused Halim=s injury, or in the alternative, that the
jury=s finding to the
contrary is against the great weight and preponderance of the evidence.  The
Medical Providers assert that Halim did not preserve error as to these
arguments.  We agree.

A Ano evidence@ issue is
preserved for appeal in one of five ways: (1) a motion for instructed verdict,
(2) a motion for judgment notwithstanding the verdict, (3) an objection to the
submission of the issue to the jury, (4) a motion to disregard the jury=s answer to a
vital fact issue, or (5) a motion for new trial.  Cecil v. Smith, 804
S.W.2d 509, 510B11 (Tex. 1991).  A party challenging the
factual sufficiency of the evidence to support a jury finding must raise this
issue in a motion for new trial to preserve error. Tex. R. Civ. P. 324(b)(2), (3); Cecil, 804 S.W.2d at
510B11.








 Halim asserted a motion for directed verdict based on
Surgical Associates=s alleged vicarious liability for
Ramchandani=s negligence, if any.  However, Halim did not seek an
instructed or directed verdict based on any ground regarding the legal
sufficiency of the evidence regarding his negligence claim against
Ramchandani.  Our record does not reflect that Halim filed a motion for
judgment notwithstanding the verdict or a motion to disregard the jury=s answer to a
vital fact issue.  Halim did assert objections to question one in the jury
charge, which asked if Ramchandani=s negligence, if
any, proximately caused Halim=s injury.  However, Halim did not object
based on the legal sufficiency of the evidence.  Halim did file a motion for
new trial, in which he argued that the trial court abused its discretion in
admitting the testimony of Weber and Ramchandani regarding alternative possible
causes of Halim=s injury.  Yet, in his motion for new
trial, Halim does not assert that the evidence at trial is legally or factually
insufficient, that Halim conclusively proved Ramchandani=s negligence
proximately caused Halim=s injury, or that the jury=s finding to the
contrary is against the great weight and preponderance of the evidence. 
Therefore, Halim did not preserve error as to the legal and factual sufficiency
arguments that he asserts in his third issue on appeal.  See City of
Houston v. Precast Structures, Inc., 60 S.W.3d 331, 335 (Tex. App.CHouston [14th
Dist.] 2001, pet. denied) (concluding appellant did not preserve error as to
legal sufficiency argument);  Electronic Bankcard Sys., Inc. v. Retriever
Indus., Inc., No. 14-04-00452-CV, 2005 WL 3435294, at *3  (Tex. App.CHouston [14th
Dist.] Dec. 15, 2005, no pet.) (concluding appellant did not preserve error as
to factual sufficiency argument) (mem. op.).  Accordingly, we overrule Halim=s third issue.

B.      Did the trial court abuse
its discretion in admitting the Medical Providers= expert testimony regarding the
possibility that the patient=s injury to his left vocal fold was caused during
intubation?

In his first issue, Halim argues the trial court erred in
admitting Weber=s testimony that the injury to Halim=s left vocal cord
was possibly caused during intubation.[7]  
The trial court made the following pre-trial rulings of record:

Yesterday, we held a pre-trial conference on March 31st and discussed
the issue of admissible expert testimony and what is or may be or may not be
admissible, and we reached the tentative conclusion for purposes of the trial
as to testimony about the causation or theories about the causation of the
injury that=s in issue in this case.








As I reconstruct in my mind, the plaintiff had a number of objections
to the theories being offered by the defendant as to how -- or defendants, as
to how this injury may have been caused, and in listening to the arguments of
counsel and reading some of the depositions in [sic] the case law, I made a
ruling on the motion in limine that the defendant would be allowed to go into
the theories of defense that the injury was a result of a pre-existing problem
with the vocal cords, perhaps aggravated by intubation in the surgery. 
Plaintiff has objected to that.  That is the tentative ruling of the Court at
this point.

The other theories of the defendant as to how the injury may have
happened, I think at the time of the hearing yesterday I didn=t hear any other theories that I thought were
supported by adequate expert opinion, so at this point my inclination is that
expert opinion only on the question of pre-existing injury and intubation would
be admissible if offered by the defendant.[8]

 

The trial court then granted Halim a running objection Ato any reference
by counsel of the farm-out theory of causation other than the nerve was
traumatically injured by Dr. Ramchandani.@  The court also
informed the parties he planned Ato listen very
closely to the testimony of all the experts who take the stand . . . and try to
make the determination that=s required of me under the case law in
terms of sufficiency of its reliability to be submitted to the jury.@    

The trial court has broad discretion to determine
admissibility of evidence, and we will reverse only if there is an abuse of
that discretion.  Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499 (Tex.
2001).  A trial court abuses its discretion only when it acts in an
unreasonable and arbitrary manner, or when it acts without reference to any
guiding principles.  Strauss v. Cont=l Airlines, Inc., 67 S.W.3d 428,
448 (Tex. App.CHouston [14th Dist.] 2002, no pet.).  We must uphold
the trial court=s evidentiary ruling if there is any
legitimate basis for it. Owens‑Corning Fiberglas Corp. v. Malone,
972 S.W.2d 35, 43 (Tex. 1998).








As Halim correctly acknowledges, on direct examination,
Weber did not testify he believed intubation had caused Halim=s injury. 
Instead, referring to published articles, the anatomy of the areas where the
nerves innervating the vocal cords are located, and his own experience, Weber
opined only that Awhen you have an endotrachael tube in the
voice box, the nerves to the voice box that control abduction or control the
bringing of the vocal cords together, can be injured from pressure.@[9]  On
cross-examination, Halim elicited Weber=s testimony that,
based on a differential diagnosis in which he credited Ramchandani=s statement he had
not injured the nerve, he (Weber) concluded the cause in this case was most
likely the endotracheal tube.  Weber also stated that nerve injury from
intubation was not common.

Halim contends Weber=s testimony was
not admissible as expert testimony under Texas Rule of Evidence 702, which
provides:  AIf scientific, technical, or other specialized
knowledge will assist the trier of fact to understand the evidence or to
determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an
opinion or otherwise.@  Tex.
R. Evid. 702.  Rule 702 imposes a special gatekeeping obligation on the
trial court to ensure the relevance and reliability of all expert testimony.  See
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 722B26 (Tex. 1998). 
Once the party opposing expert testimony objects, the proponent bears the
burden of demonstrating its admissibility.  See E.I. du Pont de Nemours
& Co., Inc. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995).  Halim does
not challenge Weber=s qualifications.  Instead, he asserts the
trial court abused its broad discretion in determining that Weber=s testimony
satisfied the reliability requirement of Rule 702.  See id. 








In determining whether the trial court abused its
discretion in ruling that Weber=s testimony was reliable, we first address
Halim=s contention that
Weber=s testimony had to
satisfy all of the factors set forth by the Texas Supreme Court in Merrell
Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706 (Tex. 1997).  In Havner,
a toxic tort case, the Texas Supreme Court analyzed whether there was legally
sufficient evidence to support a jury verdict in favor of the plaintiffs, who
sought to recover for birth defects allegedly caused by the drug Benedectin.  See
id. at 706B14.  The Havner court determined that, even
when faced with only a legal sufficiency challenge, expert testimony that is
unreliable under Robinson constitutes no evidence to support the
verdict.  See id. at 711B13.  In determining whether the testimony
of the plaintiffs= experts was reliable, the Havner
court stated several times that it was applying the Robinson factors.  See
id. at 714, 720, 724.  In doing so, the Havner court observed that
the plaintiffs relied considerably on epidemiological studies in their attempt
to prove that Benedectin is capable of causing birth defects in the general
population, and therefore, the court engaged in a lengthy and detailed analysis
of the epidemiological evidence allegedly showing a causal connection between
exposure to Benedectin and birth defects.  See id. at 711B30.  

The Havner court stated it was considering Asome of the
difficult issues surrounding proof of causation in a toxic tort case such as
this.@  Id. at
714.  In light of several facts that were not disputed by the parties, the Havner
court framed its inquiry as Awhat must a plaintiff establish to raise a
fact issue on whether Bendectin caused an individual=s birth defect?@  Id. 
Halim has not cited and this court has not found a Texas case that applies the
specific analysis in Havner regarding toxic-tort causation and
epidemiological evidence to expert testimony in a medical-malpractice case. 
Although we apply the general reliability requirement established in Robinson,
in the context of this case, we do not apply the Havner analysis.

The Robinson
court established the reliability requirement for all expert testimony, and
stated that, in determining reliability a trial court may consider many
factors, including but not limited to the following:

(1) the extent to which the theory has been or can be tested,

(2) the extent to which the technique relies upon the subjective
interpretation of the expert,

(3) whether the theory has been subjected to peer review and/or
publication,

(4) the technique=s potential rate of error,








(5) whether the underlying theory or technique has been generally
accepted as valid by the relevant scientific community,  and

(6) the non‑judicial uses
which have been made of the theory or technique.

Robinson, 923 S.W.2d at
557.  The reliability analysis is a flexible one, and the Robinson court
emphasized that these six factors are non-exclusive and that trial courts may
consider other factors that are helpful in determining reliability. See id. 
Consistent with this reasoning, the Gammill court held that, in
determining reliability, a court need not apply the six Robinson factors
to expert testimony, whether scientific or not, that is based on the expert=s experience and
knowledge in his field.  See Gammill, 972 S.W.2d at 726B28; Taylor v.
American Fabritech, Inc., 132 S.W.3d 613, 619 (Tex. App.CHouston [14 Dist.]
2004, pet. denied).  In Gammill, the Texas Supreme Court stated that the
trial court had essentially determined the reliability of the expert testimony
by asking whether there was too great an analytical-gap between the data and
the opinion proffered.  See Gammill, 972 S.W.3d at 727.  The Gammill court
reviewed the trial court=s ruling for an abuse of discretion based
on this same inquiry.  See id. at 727B28.  In
discharging its duty as Agatekeeper,@ the trial court
is in the best position to decide whether some or all of the Robinson
factors and/or the Gammill analytical-gap test should be applied to
determine the reliability of the expert=s testimony.  See
Gammill, 972 S.W.2d at 726.  

At trial Ramchandani argued that the Gammill test
should be used, and the trial court described its determination of the
reliability of Weber=s testimony in part by stating that ADr. Weber=s testimony seems
to be based on his personal experience and studies, and I think it=s reliable enough
to be considered by the jury.@  It appears that the trial court used the
Gammill analytical-gap test to determine the reliability of Weber=s expert testimony
based on his experience and knowledge; therefore, we determine whether the
trial court abused its discretion under this same test.  See Gammill,
972 S.W.3d at 727B28; Taylor, 132 S.W.3d at 619.  








                       Expert Testimony Elicited by
the Medical Providers

Weber=s testimony on direct examination
consisted primarily of (1) a physiological and anatomical explanation of how an
endotracheal tube can create pressure on the nerve (that is, the recurrent
laryngeal nerve) that controls the voice box (larynx) and result in vocal cord
paralysis, (2) brief references to reports in the literature and to a cadaver
study in which they looked Aat where the nerve might be compressed,@and (3) Weber=s specific
reference to a patient he treated who had abdominal surgery and awakened with
vocal cord paralysis.  Weber explained, AThis isn=t something that we can prove.  This
is what, through cadaver studies, is supposed to happen because we know that it
happens, and so we assume that it is a pressure phenomena either at the joint
or somewhere in the larynx, from pressure causing the nerve to not work.@  On subsequent
redirect examination, Weber expounded that, in the cadaver study, when they
performed the dissection, they could see that the nerve sits on the muscle
between the cartilage and the inside of the voice box.  Therefore, Athe thought is
that [it=s] pressure, and
it=s not a proof,
this is what their supposition was, but it=s the most
logical.@

At trial, Weber testified that, as an otolaryngologist head
and neck surgeon, he is intimately familiar with the structure of the larynx
and the nerves and muscles that control the voice.  According to his deposition
testimony, Weber performs thyroidectomies, in which there is a potential for
paralyzing the vocal cord.  During that surgery, a good thyroid surgeon
dissects out the recurrent laryngeal nerve and does not injure it.  According
to Weber=s trial testimony,
on every thyroidectomy he performs, he exposes the recurrent laryngeal nerves
and dissects them out.  This surgical experience supports his representation
that he has knowledge and experience regarding the structure of the larynx and 
the nerves and muscles controlling the voice.  Weber also treated a number of
patients with vocal cord paralysis following surgeries that did not involve the
larynx.  Just four weeks before trial, he treated a woman who had sustained
vocal cord paralysis after a hysterectomy.








The published articles upon which Weber relied consisted of
a case study,[10]
an anatomical analysis based on cadaver dissection,[11]
and a prescriptive article.[12] 
Of these, the anatomical study provides the strongest support for Weber=s explanation of
the possible means by which intubation can injure the vocal cord nerves.  The
author lists thirty-six cases taken from multinational literature of Atrue vocal cord
paralysis following endotracheal intubation@ in patients
ranging in age from 15 years to 72 years, Afor which there is
little possible explanation aside from peripheral nerve damage [which]
[p]resumably . . . occurred either during the intubation or during the
anesthetic.@  John Cavo, Jr., M.D., True Vocal Cord Paralysis Following Intubation,
95 Laryngoscope 1352, 1352B53 (1985).  Of these, 32
cases Awere clearly the
outcome of endotracheal intubation.@  Id. at
1356.  The author described the phenomenon as Arare.@  Id.








The author  undertook a study of dissections of ten cadaver
larynxes to determine the likely point of injury.  Id.  at 1352B53.  Based on
these dissections, he traced the location of the recurrent laryngeal nerve
through the tracheal region, the cricoid region, and the thyroid region.  Id.
at 1354B55.  He concluded
the Aprobable site of
injury to the recurrent laryngeal nerve to be located in the subglottic region.@  Id. at
1357.

That intubation can cause pressure on the nerves
controlling the vocal cords or folds is a logical deduction from the anatomical
structure as described in the cadaver studies and as observed by Weber.  Weber
testified any type of pressure is a recognized potential element of nerve
injury, and Halim does not dispute this point.  Given the nature of Weber=s practice and his
having A[t]reated a number
of patients with this problem over the years,@ the trial court
reasonably could have inferred that Weber, independently of the litigation,
reached the conclusion that intubation can cause vocal cord paralysis.  See
Robinson, 923 S.W.2d at 557 n.2 (indicating, if expert testifies based
on research conducted independent of litigation, such is important, objective
proof the research comports with dictates of good science). Likewise, the trial
court reasonably could have decided there was a sufficient analytical
connection between Weber=s knowledge of this literature and his
conclusion that intubation can damage the vocal cord nerve.  The trial court
also reasonably could have determined there was a sufficient analytical
connection between Weber=s experience with patients suffering
damage to the vocal cord nerve and his conclusion that intubation can damage
the vocal cord nerve

After carefully reviewing the testimony, we hold that the
trial court did not act unreasonably or arbitrarily in concluding that there
was not too great an analytical-gap between Weber=s opinions and the
basis upon they were founded.  Therefore, the trial court did not abuse its
discretion in determining that Weber=s testimony was
reliable.  See Taylor, 132 S.W.3d at 619B23 (holding trial
court did not abuse its discretion in concluding experts= testimony was
reliable under analytical-gap test); In re D.S., 19 S.W.3d 525, 529B30 (Tex. App.CFort Worth 2000,
no pet.) (holding that trial court did not abuse its discretion in determining
there was not too great an analytical-gap between the a doctor=s expert opinions
regarding the cause of a child=s burns and the basis on which these
opinions were founded).  








                                        Testimony
Elicited by Patient

Most of Weber=s testimony on
cross-examination was given in response to attacks on his credibility or on the
validity of his testimony on direct examination.  See State v. Chavers,
454 S.W.2d 395, 398 (Tex. 1970) (stating that, once evidence has been admitted
over party=s objection, objecting party may, without waiving its
objection, defend itself against this evidence by attacking the  evidence
admitted, but party may not go beyond defending itself against the evidence
admitted).  The trial court did not abuse its discretion in allowing this testimony. 
However, to the extent Weber testified on cross-examination that intubation
caused Halim=s vocal cord paralysis or that this injury was most
likely due to intubation, this testimony exceeded the scope of the testimony
introduced by Ramchandani,
and thus by introducing this evidence, he waived any objection.  








Although Halim obtained a pre-trial ruling and a running
objection at the beginning of trial, he waived his objection to Weber=s testimony that
the endotracheal tube was the cause or the most likely cause of Halim=s injury by being
the only party to introduce this evidence. [13] 
See Sw. Elec. Power Co. v. Burlington N. R.R., 966 S.W.2d 467, 472 (Tex.
1998) (holding that objecting party waived appellate complaint regarding
admission of evidence when it invited the alleged error by being the first
party to introduce the allegedly objectionable evidence); McInnes v. Yamaha
Motor Corp., U.S.A., 673 S.W.2d 185, 188 (Tex. 1984) (holding that party
waived objection regarding admission of evidence by being the first party to
introduce that evidence at trial); Gill v. Slovak, No. 13-02-582-CV,
2005 WL 2805543, at *1B2 (Tex. App.CCorpus Christi
Oct. 27, 2005, pet. denied) (holding that, although party at first preserved Robinson
reliability challenge by obtaining adverse ruling from trial court, objecting
party waived its right to complain about the admission of the expert testimony
in question because the objecting party was the one who introduced the evidence
in question at trial) (mem. op.); GTE Mobilnet of S. Tex. Ltd. P=ship v. Pascouet, 61 S.W.3d 599,
612 (Tex. App.CHouston [14th Dist.] 2001, pet. denied) (concluding
error was waived under invited-error doctrine when complaining party asserted
in trial court that allegedly inadmissible evidence was an integral part of the
claims at issue); Haney v. Purcell Co., 796 S.W.2d 782, 788 (Tex. App.CHouston [1st
Dist.] 1990, writ denied) (holding that objecting party waived error by being
the first to offer and obtain admission of allegedly objectionable evidence). 
Even if Halim had not waived his objection to this part of Weber=s testimony, we
still would conclude that the trial court did not abuse its discretion in
determining that there was not too great an analytical-gap between the opinions
Weber proffered and the basis upon which Weber=s opinions were
founded.  Accordingly, we overrule Halim=s first issue.

C.      Did the
trial court abuse its discretion in admitting the Medical Providers= expert testimony
regarding the patient=s alleged physical
anomaly?

In issue two, Halim argues the trial court erred in
permitting evidence of an alleged physical anomaly in Halim (that is, that his
vocal cords deviated left) when there was no expert testimony that such an
anomaly played any role in causing Halim=s injuries.  Halim
provides this court with only two citations to purportedly objectionable
testimony.  Halim called Fraser as an adverse witness in his case in chief. 
The first citation appears in Halim=s counsel=s examination of
Fraser:

Q         All right.  So it is your opinion that the damage to Mr.
Halim=s vocal cords occurred while he was being
hospitalized?

A         I think so.

Q         And the only time during his hospitalization that that
reasonably could have happened would be during his surgery?

A         Again, the timing or how this occurred I do not know.  I
would have to again allude to the noted abnormality of the vocal cords at the
time of intubation, which to me was puzzling.








Q         So C And let=s
walk through that a little bit, so everybody understands.  You and I know what
we are talking about, but let me flesh it out a bit.  What you are talking
about is that as part of your work in this case, you wanted to look back and
see if there was any evidence of a vocal cord deviation prior, in Mr. Halim. 
Right?

A         Yes.

Q         And your curiosity was roused by the fact that there was a
note in the anesthesia record that said, Vocal [sic] cord deviated left, is how
you read it?

A         Yes.

Q         And you found that puzzling?

A         Yes.

Q         You actually interpreted that note to mean the left vocal
cord was deviated to the left?

A         I did.

Q         And C but the note actually didn=t say the left vocal cord about anything [sic], did
it?

A         No, it didn=t.  It said
vocal cord deviated to the left.

Q         Okay.  One of the things you looked at on behalf of
defendants, was you wanted to look at the CT scan that was done on Mr. Halim
just a week before his surgery to see if you could tell if there was any
problem with the vocal cords, right?

A         That is correct.

Q         And that CT was done on him in order to check him out before
surgery?

A         Yes.

Q         And when you looked at the CT scan, you found no evidence of
deviation, correct?

A         That is correct.[14]

 

The second passage to which Halim objects was elicited on
Ramchandani=s subsequent examination of Fraser:








Q         What she noted down here, can you read that?

A         In the comments?

Q         Yes.

A         AVocal cord deviates to left.@

Q         Now, that comment section, is that reserved for the
anesthesiologist to write whatever?

A         Yes.

Q         Is it your experience that anesthesiologists routinely
document what they think to be a normal finding?

A         In the comments section?

Q         Yes.

A         They do not.

Q         Would it make sense to you that if this is documented in the
comments section, probably she found it a bit unusual that the vocal cord is
deviated to the left?

[Halim=s
counsel]: Continue to object as leading.

[Trial Court]: Sustained.

Q         (By Medical Providers=
counsel) What do you make of her having taken the time to write that comment on
the chart?

A         Well, as I noted in my original review of the records and my
deposition, same thing.  It didn=t
seem to me a coincidence that there was something wrong with the vocal cords.

Q         In order for her to see the cord at this point, would this
observation have had to have been made before the surgery?

A         The patient is anesthetized and has a breathing tube or has
endotracheal intubation before the surgery.  Again, as I was alluding to
earlier, in terms of a fixable point in time to document where the vocal cords
were.

Q         So then in light of the way things were done with the patient
being intubated before C and by intubated, I mean a tube stuck down the throat
to allow breathing when you=re unconscious,
in light of the way that=s done, this observation, would I be correct in
saying, had to be made before the operation took place?








A         Yes.  The anesthesia is
induced and the anesthesiologist looks down into the wind pipe so that he or
she may visualize the proper hole to put the tube in.  The proper orifice.

During his examination of Fraser, Halim=s counsel referred
to deposition testimony by Swafford in which Swafford stated her comment did
not mean there was anything wrong with one vocal cord but that she was saying
Halim had an anatomical anomaly because the whole structure of his throat
shifts to the left at the vocal cord level.  After Fraser=s testimony, Halim
called Swafford as a witness.  Swafford testified she had noted Halim=s A[v]ocal cords deviated to the left@ because the entire area of Halim=s vocal cords shifted to the left. 
Swafford indicated that this condition was common and that some people are just
born with a different anatomical structure.  Swafford also testified that the
reason she noted that Halim=s intubation was difficult was Amore than likely . . . because of the
deviation of the cords.@  Halim=s motion to exclude did not refer to Swafford=s testimony, and Halim does not
challenge Swafford=s testimony on appeal or argue it was necessary to rebut
Fraser=s testimony.  Presuming for the sake
of argument that the trial court erred in admitting evidence of Halim=s alleged physical anomaly, given
Swafford=s testimony regarding this anomaly,
we cannot say that any error in admitting the quoted portion of Fraser=s testimony probably caused the
rendition of an improper judgment.  See Tex. R. App. P. 44.1(a); Richardson v. Green, 677
S.W.2d 497, 501 (Tex. 1984) (stating general rule that that error in the
admission of testimony is deemed harmless if the objecting party subsequently
permits the same or similar evidence to be introduced without objection); Olympic Arms, Inc.
v. Green, 176 S.W.3d 567, 586B87 (Tex. App.CHouston [1st
Dist.] 2004, no pet.) (holding party waived objection to testimony because the
same or similar testimony was later introduced without objection).  Accordingly, we overrule the second
issue.








Having overruled Halim=s three issues, we
need not address the Medical Providers= conditional cross-issues. 
We affirm the trial court=s judgment.

 

 

 

/s/      Kem Thompson
Frost

Justice

 

 

 

Judgment rendered
and Opinion filed August 31, 2006.

Panel consists of
Justices Frost, Seymore, and Mirabal.[15]









[1]  Myasthenia gravis is Aa disorder of neuromuscular transmission marked by fluctuating weakness
and fatigue of certain voluntary muscles.@  Steadman=s Medical Dictionary 1167 (27th ed. 2000).  It results from an autoimmune
mechanism.  Id.





[2]  Two nerves relevant to vocal cord function are
discussed throughout the testimony.  They are the  vagus nerve and the
recurrent laryngeal nerve.  The vagus nerve is a mixed nerve that runs from the
cranial cavity and passes down to supply several organs, including the larynx. 
See Steadman=s
Medical Dictionary 1202 (27th ed. 2000). 
The recurrent laryngeal nerve is a branch of the vagus nerve.  Id. at
1200.  At one point it passes Asuperiorly,
posterior to the common carotid artery between the trachea and the esophagus to
the larynx; it supplies cardiac, tracheal, and esophageal branches and
terminates as the inferior laryngeal [nerve].@  Id.  We use the terms Anerve,@ Anerves,@ or Avocal cord
nerves,@ unless the context requires specification of one or
the other of the two nerves.





[3]  Halim non-suited The Methodist Hospital before
trial, and it is not a party to this appeal.  Halim sued Surgical Associates
based on theories of vicarious liability, employee-employer liability, and
respondeat superior.





[4]  The defense did not call Ramchandani in its own case
or cross-examine him during Halim=s
case.





[5]  Halim=s
expert testified that, in all likelihood, Ramchandani did not injure the vagus
nerve.





[6]  We discuss both Halim=s and the Medical Providers=
expert testimony in more detail in the analysis section that follows.





[7]  Halim also refers to Ramchandani in his statement of
the first issue, but he does not mention  Ramchandani=s testimony in the body of his argument.  Therefore,
Halim has waived any challenge to Ramchandani=s testimony.  See Tex. R.
App. P. 38.1(h) (stating appellant=s
brief must contain clear and concise argument for contentions made, with
appropriate citations to authorities and to the record); San Saba Energy,
L.P. v. Crawford, 171 S.W.3d 323, 337 (Tex. App.CHouston [14th Dist.] 2005, no pet.) (declining to
address issue when parties cited no part of the record and make no specific
argument in support of issue).





[8]  The appellate record does not contain a reporter=s record, if any, of the pre-trial conference.





[9]  In his motion to exclude Weber=s testimony, Halim argued that Weber=s deposition opinion that  endotrachael intubation
caused Halim=s injury, absent any evidence of trauma to the vocal
cord, was Anot based on any scientific studies or widely accepted
scientific literature,@ but was Abased
purely on blind, subjective analysis.@
Halim=s expert testified that he did not believe that
intubation could have caused Halim=s
injury unless there was evidence of physical injury to the vocal cords, which
there was not. 





[10]  Juhani Nuutinen, M.D. & Juhani Kärjä, M.D., Bilateral
Vocal Cord Paralysis Following General Anesthesia, 91 The Laryngoscope 83 (1980).





[11]  John Cavo, Jr., M.D., True Vocal Cord Paralysis
Following Intubation, 95 Laryngoscope
1352 (1985).





[12]  Ernest A. Weymuller, Jr., M.D., Prevention and
Management of Intubation Injury of the Larynx and Trachea, 13 Am.  J. of Otolaryngology 139 (1992). 
Although the author does not cite Cavo=s
anatomical study, he appears, as recently as 1992, to agree with at least one
of the conclusions from that study:

 

Acute vocal cord paralysis after intubation probably
relates to inflation of the endotrachael tube cuff at the level of the
subglottic larynx.  At this location fibers of the recurrent laryngeal nerve
enter between the cricoid and thyroid cartilage to innervate the intrinsic
muscles of the larynx.  Vocal cord paralysis is thought to result from direct
pressure by the cuff causing neural injury (neuropraxia).

 

Id. at 140. 
Halim characterizes the article as citing only to a study on rabbits in support
of this proposition.  The citation to which Halim refers, however, appears
later in the same paragraph in conjunction with a prescription regarding safe
maximum cuff pressure.  See id. at 140, 144 n.2.  Swafford testified she
considers the American Journal of Otolaryngology a credible resource.





[13]  Without waiving his objection, Halim was free to (1)
attack Weber=s credibility and the validity of his testimony on
direct examination and (2) offer evidence to rebut Weber=s testimony on direct examination.  See Chavers,
454 S.W.2d at 398.  However, Weber=s
testimony on cross-examination that intubation caused or likely caused Halim=s specific injury does not rebut Weber=s testimony that intubation can cause vocal
cord paralysis.

 

 





[14]  Halim cites a single page for both passages.  In
this excerpt, as in the following excerpt, we include testimony preceding and
following the cited page to put the testimony in context.





[15]  Senior Justice Margaret G. Mirabal sitting by
assignment.